[No. 37261. Department Two. April 1, 1965.]

ROBERT O. LEACH et al., Appellants, v. ELLENSBURG HOSPITAL ASSOCIATION, INC., Respondent.*

J. P. Tonkoff (of Tonkoff, Holst & Hanson), for appellants.

Gavin, Robinson, Kendrick & Redman and Kern, Dano & Cone, for respondent.

DONWORTH, J.—This is an appeal from a directed verdict and judgment for the defendant, Ellensburg General Hospital Association, Inc., in a suit brought by plaintiffs husband and wife to recover damages arising from a "burn" in the small of the wife's back which appeared while she was in a body cast during confinement in the hospital for

*Reported in 400 P. (2d) 611.

treatment of a broken vertebra. For convenience, the plaintiffs will be referred to herein as appellants, and the wife, individually, as Mrs. Leach.

There are two major questions on this appeal. First, did the hospital have the kind of control over the cause of the injury (*i.e.* the "burn") necessary for the application of the doctrine of res ipsa loquitur? Second, did appellants produce sufficient evidence of "proximate cause" between acts or responsibilities controlled by the hospital and the injury to Mrs. Leach so that the question of causation should have been given to the jury? Both of these questions must be answered affirmatively if the directed verdict is to be held erroneous and the judgment of the trial court is to be reversed.

The facts are as follows: On August 9, 1962 (Thursday), Mrs. Leach wrenched her back when she grabbed a stick to hit a dog in an attempt to stop the dog from attacking a cat. Her husband took her to see a doctor, who X-rayed her back and diagnosed her condition as a fractured twelfth thoracic vertebra. He prescribed hospital confinement and application of a body cast. She was taken to respondent hospital by ambulance from the doctor's office. Although her confinement began on August 9, no cast was applied until the morning of August 13, 1962, because of an unrelated internal body condition.

On Monday, August 13, 1962, hospital employees, nurses, and an orderly prepared her for a cast by dressing her in a white T shirt, over which was applied a ½-inch layer of felt. The felt was sewn so as to fit her like a vest from just under her arms down to her hips. She was then taken to the cast room, where the cast was applied by two doctors, who testified at the trial.

According to the hospital records, Mrs. Leach was taken to the cast room at 10:45 a.m. and was returned from the cast room at 11 a.m. Present in the cast room at the time were three nurses and a hospital orderly, Mrs. Leach's doctor, and another doctor who assisted in the application of this first cast.

As soon as she arrived in the cast room, Mrs. Leach was

placed between two tables, with her arms and head on one table, and her legs up to her upper thighs on another table, so that she hung suspended between the two tables. The position is very uncomfortable, but necessary in order to produce a backward curve of the spine, so as to set the fracture. Mrs. Leach was assisted into this position, and held there by two nurses and the orderly. The other nurse aided the doctors in the application of the cast by holding the splints in place. The two doctors applied the cast and directed the procedure for its application.

All during the period from August 9, 1962, when Mrs. Leach was admitted to the hospital, until after the cast was applied on August 13, 1962, she was given various drugs, including pain relievers. Her testimony is that she was unconscious from about the time she assumed the position described above for the application of the cast until the time when she was wheeled back to her room from the cast room. She admits being conscious at the time she was taken into the cast room and put into that position.

All persons attending her in the cast room testified that she appeared conscious all during the application of the cast. Her doctor and his assistant testified that Mrs. Leach was conscious the whole time because it was necessary that she be conscious in order for her to co-operate in the application of the cast. There is no doubt, of course, that she was under some degree of sedation from the drugs. She complained about pain caused by her position between the tables, which indicated her consciousness at that time. Whether or not she was conscious, and to what degree she was conscious after that, is a disputed question of fact.

The procedure in the application of the cast consisted of the doctors' dipping the plaster-treated wrappings into water, then applying the wrappings to the felt vest so as to build up a layer of plaster. For a period of about 8 minutes, there is a crystallization process in the plaster which is called "setting up," which generates some heat. There was no testimony as to how much heat is generated in terms of objective measurement. However, the testimony of nurses familiar with the process was to the effect that

patients often complain of the heat and that a fan is used for the purpose of cooling off the cast. The cast is usually warm to the touch and there is testimony that the cast of Mrs. Leach was warm on her return from the cast room.

There is testimony that Mrs. Leach complained of pain and heat, both while in the cast room and on her return to her hospital room. Mrs. Leach testified that the pain was like that of a hot poker in her back. One nurse testified that an electric fan was used to cool the cast of Mrs. Leach after she returned to her room because Mrs. Leach complained of a burning sensation on her back. The hospital record shows that Mrs. Leach complained that the cast was burning her back, but the hospital record does not show application or removal of the fan.

Mrs. Leach later complained of being cold shortly after 3 p.m., after the fan was removed. A nurse who had just come on duty felt her cast and determined that it was cold and clammy. The nurse then turned on a portable heat lamp and applied it to the back of Mrs. Leach's cast. The hospital record shows that the lamp was turned on at 3:30 p.m., but it does not show when the lamp was taken off. Testimony of the two nurses on duty on that floor was to the effect that the lamp must have been taken off Mrs. Leach's cast about 4:45 p.m., because the patients are fed at 5 p.m. and the hospital record shows that this patient was fed at that time, although she ate little. There is testimony by her doctor and his assistant that the heat lamp used is not capable of making a burn through the plaster of the cast, the felt vest, and the T shirt.

There is testimony by both doctors and the three nurses present in the cast room at the time the cast was applied, that no heat lamp was used to dry the cast while Mrs. Leach was in the cast room. There is testimony that a portable X-ray machine was in the cast room. Mrs. Leach testified that there was a heat lamp in the cast room at the time the first cast was applied. Respondent argues that Mrs. Leach may have mistaken this X-ray machine for a heat lamp.

On Tuesday morning, August 14, 1962, prior to 11 a.m., Mrs. Leach's doctor checked her cast and noticed a wrinkle in the felt under the back of the cast. He immediately cut a window in the back of the cast, cut out the bulge in the felt, and restitched the felt so it would lie smoothly. He then patched the window with plaster. The doctor testified that he did not notice any blisters, nor did he cut through the T shirt so that he could have seen blisters.

Four days later, the "burn" was discovered, on Friday, August 17, 1962. Mrs. Leach's doctor wrote in his record on that day that the figure conformation of Mrs. Leach was such that a cast would slip on her regardless of how it was applied. In other words, Mrs. Leach could and did turn her body inside the cast. The doctor and his assistant, at the application of the first cast, admitted that such an injury as that received by Mrs. Leach could be caused by thermal heat, but each doctor also testified without reservation that this particular injury was caused by abrasion, that is, rubbing of the cast on her back. Persistent cross-examination by appellant's counsel did not change this testimony. Depositions of these doctors were to the same effect. No reason was given by either doctor for this diagnosis.

The hospital records show that Mrs. Leach complained of the cast hurting her back during the days from August 13 to August 17 (Monday through Friday) whenever she was up, and that she was very restless when she was not up. Her original complaints about feeling a burning sensation in her back occurred mainly on the first day, however. Mrs. Leach's own testimony does not differentiate between her complaints on the 13th and her subsequent complaints, except to explain that she could discern between the pain from her fractured back and the pain from her subsequent injury (the burn), which latter pain she described as like a hot poker in her back.

The hospital record made by one nurse on Friday, August 17, 1962, at about 1 p.m., reads:

"While on back checked to see why pt. complained of the burning. Found blisters—same had broken—T shirt satu-

rated with drainage. Tyroderm & gauze applied to area. X-ray of back downstairs."

In this same record is found the following entry as of 3 p.m. "Cast removed as ordered. Pillow under back." Mrs. Leach was kept in bed with pillow support for 4 days, until August 21, 1962, while her injury healed enough for re-application of the cast.

On Tuesday, August 21, 1962, a new cast was applied, which caused no discomfort to Mrs. Leach either as to heat or fit, and she was released from the hospital two days later, on Thursday, August 23, 1962. Mrs. Leach testified that after the second cast was applied she heard a nurse ask her doctor if the heat lamp should be used. She stated that her doctor responded, "No, we won't try that a second time." Mrs. Leach testified that the nurse actually reached for a heat lamp which was in the cast room during the application of the second cast, and that this was the same lamp that was in the cast room when the first cast was applied. Both the nurse and the doctor deny that any conversation to this effect ever occurred in the cast room, and both deny that a heat lamp was ever in the cast room.

At the end of all the evidence, respondent moved for nonsuit and order of dismissal, or, in the alternative, for a directed verdict and judgment in its favor on the same grounds. The motion to dismiss had been made originally at the end of appellants' evidence. The trial court had reserved ruling on the motion and directed respondent to present its evidence. The pertinent grounds argued by respondent in the trial court in support of its motion were as follows:

"Specifically, and as a part of the same motion and alternative motion, it is urged by the defendant that the Court, having reserved its ruling on the Motion to Dismiss and not having passed upon it at the time it was first interposed at the conclusion of plaintiffs' case, and it appearing at that time that the only reason for permitting or directing the defendant should proceed and offer its evidence in defense of the action was because of the plaintiffs' application of the doctrine of *res ipsa loquitur* of which the plaintiffs might

take advantage, and that it now appears, all parties having rested and all evidence being before the Court, that:

"(1) The plaintiffs indeed are not and were not entitled to take advantage of the doctrine of *res ipsa loquitur* for it appears beyond question that the control of the patient at the time in which it is claimed that her injury was sustained was not exclusive control on the part of the hospital, but that control indeed was not in the hospital at all.

"(2) And it appears that even if the doctrine of *res ipsa loquitur* were applicable, which throws upon the defendant the burden of coming forward and producing evidence which would show the conditions of which the plaintiff complains were not caused by any negligent conduct of the defendant, at the time.

"The evidence is undisputed now that the defendant has shown that this particular claim of accident or injury made by the plaintiffs is not the proximate result of any act or omission on the part of the hospital, and, therefor, *res ipsa loquitur*, if applied, has spent itself, since the plaintiffs, after the defendant's exculpatory evidence has been received, did not come back in rebuttal and bear the burden and establish by a preponderance of the evidence that it was the negligent act of the defendant, despite its exculpatory explanation, which did cause the injury or damages of which the plaintiffs complained."

The trial court granted the motion for a directed verdict and judgment in favor of respondent, with the following explanation:

"As far as I am concerned *res ipsa loquitur* does not apply and plaintiffs have failed in their proof and I will direct a verdict in favor of the defendant."

Appellants have assigned error to the directed verdict and judgment of dismissal.

This was a jury trial. In passing upon a motion for a directed verdict, the trial judge must assume the truth of all evidence favorable to the opposing party and interpret the evidence most strongly in favor of the opposing party. This court has long been committed to the rule as it is stated in *Parrish v. Ash,* 32 Wn. (2d) 637, 648, 203 P. (2d) 330 (1949):

"A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for a directed verdict, or a motion for

judgment notwithstanding the verdict admits the truth of the opposing party's evidence and all inferences that reasonably can be drawn therefrom and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the party against whom the motion is made. *Billingsley v. Rovig-Temple Co.*, 16 Wn. (2d) 202, 133 P. (2d) 265; *White v. Fenner*, 16 Wn. (2d) 226, 133 P. (2d) 270."

In *Helman v. Sacred Heart Hospital*, 62 Wn. (2d) 136, 149, 381 P. (2d) 605 (1963), this court had occasion to apply that rule to a trial court's denial of a motion for judgment n.o.v. in a hospital negligence action. This court stated:

" 'Such a motion involves no element of discretion and will not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from evidence sufficient to sustain the verdict. In ruling on a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the party against whom the motion is made, and all material evidence favorable to the contention of the party benefited by the verdict must be taken as true. If there is substantial evidence supporting the verdict of the jury, as distinguished from a mere scintilla of evidence, the verdict must stand. By "substantial evidence" is meant that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed. . . .'

" . . . Had the court either granted the motion for a judgment non obstante veredicto or sustained the challenge to the evidence, it would have invaded the province of the jury and substituted its judgment for that of the jury in weighing the evidence. . . ."

Accordingly, in passing upon the trial court's action in directing a verdict in this case, we must likewise consider the evidence in the light of the rule expressed above in the same manner as that rule has been applied in cases like *Helman v. Sacred Heart Hospital, supra.*

 The evidence introduced by appellants pertained to the legal doctrine of res ipsa loquitur, on which they relied at trial. In a recent decision by this court, the doctrine of res ipsa loquitur as it applies to hospitals was summarized and discussed. In *Horner v. Northern Pac. Beneficial Ass'n*

*Hospitals, Inc.,* 62 Wn. (2d) 351, 359, 382 P. (2d) 518 (1963), this court said:

"Further proof of negligence is not essential to take a case to the jury or to overcome challenges to the sufficiency of the evidence where (1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff. Prosser on Torts (2d ed.), chapter 7, § 42, pp. 199, 201; *Chase v. Beard,* 55 Wn. (2d) 58, 346 P. (2d) 315."

Respondent challenged the sufficiency of the evidence submitted at trial to establish factor (2) of this rule. For purposes of this appeal, it is assumed that factors (1) and (3) are established.

Respondent's challenge pertains to two separate elements of factor (2); *i.e.* (a) respondent contends that the evidence does not show the exclusive control of the hospital, and (b) respondent contends that the evidence shows that the *cause* of the injury either was unexplained, and therefore speculative, or was caused by treatment which was under the control of the doctors. Another way of stating this challenge to the second element (b) is that respondent contends that there is no evidence which, even when viewed favorably to appellant, shows what caused the injury. If either challenge is sustained, the decision of the trial court must be affirmed.

For the sake of clear understanding of the resolution of these issues, it is necessary to discuss the evidence as to the cause of the injury, and then discuss the evidence as to who controlled the cause or possible causes.

Appellant wife has shown by her evidence that she entered the hospital without the injury of which she complains, and that 8 days later, during which time appellant wife had been continuously confined in the hospital, a nurse of the hospital discovered her injury, which was immediately treated. Appellant wife has also produced evidence tending to show that her injury was of a kind that *could* be

caused by thermal heat, that such an injury would not normally occur except by negligence of the party controlling the source of heat, and that the hospital nurse applied thermal heat to her cast by means of a "heat lamp" while appellant wife was in her hospital room.

If the evidence had shown no more, there is no doubt that appellants would have introduced sufficient evidence to take the question of causation to the jury. However, respondent claims to have met its burden of coming forward with evidence to show (1) that the lamp could not have caused the injury, and (2) that the injury was caused by the rubbing of the cast, which was a treatment (instrumentality) applied under the control of the doctor, and hence *not a cause* for which the hospital can be held responsible.

It is true that the testimony of one of the doctors who had applied appellant wife's first cast stated that, in his opinion, the heat lamp could not burn through the plaster cast, the felt vest, and the T shirt. However, no explanation of, or basis for, his opinion was offered or given. The jury could, therefore, disregard the opinion if the jury considered it directly contrary to the circumstantial evidence in the case, especially if the cause of the injury was not explained by respondent to the satisfaction of the jury.

A good example of a case in which the only expert testimony in the case was disregarded by the jury when it awarded a verdict was in *Helland v. Bridenstine*, 55 Wash. 470, 104 Pac. 626 (1909), which is a medical malpractice case. In that case, the plaintiff asserted that gonococci were introduced into her in the course of a pelvic examination by the use of an unsterilized and unclean medical instrument. The defendant physician countered this evidence with strong proof that the very instrument had been unused for 4 days; that gonococci would not survive during a 4-day interval at evening office temperatures of 50 to 55 degrees fahrenheit; that the instrument had not been used on a patient infected with gonorrhea for several months; that the instruments were, in fact, sterilized before each use, and that he had sterilized them before use in this instance.

In that opinion, this court stated, at page 475:

"There was here, we think, sufficient evidence on the questions of the appellant's negligence, whether the respondent had actually become infected with gonorrhea, and whether the disease was communicated to her by means of the instruments the appellant had used upon her person, to require their submission to the jury. The respondent was not required to prove her case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that she show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. If it be true (and whether or not it is true was for the jury) that the respondent went to the appellant's office free from gonorrhea; that the appellant introduced into her vagina a speculum, which he used on other patients, without cleansing or sterilizing it, and that within the time thereafter usual for such a disease to generate, she became afflicted with the disease, *and there was no other known source of infection*, it is a reasonable inference that she caught the disease from the instrument used upon her by the appellant, and that the disease was negligently communicated to her. *Nor is the inference so far overcome by the evidence of the expert witnesses as to require the court to take the question from the jury.* None of them purported to testify how long the microbe gonococcus would live on a speculum which was wrapped in a towel and placed in a drawer in the temperature of the appellant's office, and the court is not at liberty to assume that their evidence related to such a condition. Moreover, the opinions of experts are taken to aid the jury in arriving at the ultimate fact, and no matter how positive may be their conclusions drawn from a given state of facts, it is still a question for the jury whether or not the facts recited on which the conclusion is based are the facts proven by the evidence, and whether or not the conclusion is correctly drawn. . . ." (Italics ours.)

We believe that, if the case had been submitted to the jury, it would have had the same right in the present case to weigh the expert opinion against the facts as they viewed them.

Respondent claims, however, that in this case the cause of the injury to Mrs. Leach was conclusively shown to have been caused by the rubbing of the cast, because her doctor

and his assistant both testified directly to this effect. But on cross examination, the doctors admitted that such an injury *could* be caused by thermal heat. The doctors insisted that the injury was caused by the rubbing in this instance, but they gave no reasons for their opinions. It was also developed in testimony by both doctors and the various nurses who testified that (1) the doctor had removed the wrinkle in the felt on the second day, yet the injury was not discovered until the fifth day after the cast was applied, and (2) that Mrs. Leach complained about the burning sensation at a time immediately after the cast was applied. At this time an abrasive burn could not yet possibly have occurred. It is also obvious that the doctor wrote in his record that the shape of Mrs. Leach was such that a cast would always slip and rub on her, but he wrote this only after the injury was discovered rather than on the day when he removed the wrinkle in the cast. It is apparent, too, that the *second* cast caused no discomfort and fitted well. Under the circumstances, it is quite within the discretion of the jury to disregard the testimony and conclusions of the doctors who testified. Their testimony simply does not appear to mesh with the physical evidence as it appears in the record. That is not to say that their testimony and the other evidence are necessarily contradictory, but the physical evidence does give a basis on which the jury could disbelieve or disregard the testimony of the doctors as inconsistent with the physical evidence in the case.

Under the rule quoted from *Parrish v. Ash, supra,* in view of the way in which that rule has been applied in Washington over a long period of time, as shown by *Horner v. Northern Pac. Beneficial Ass'n Hospitals, Inc., supra,* and *Helland v. Bridenstine, supra,* the trial court erred in directing a verdict on these jury questions.

However, respondent argues that *if* this was error, still the judgment should not be reversed because the hospital did not have exclusive control of the patient's treatment, and, therefore, it cannot be held liable under the theory of

res ipsa loquitur. There are three thrusts to respondent's argument.

First, respondent argued that the cast caused the "burn" and that the application of the cast was in the control of the doctor. If the jury were to find that the rubbing of the cast caused the injury, then respondent's legal position is correct. But if the jury found that the injury was caused by the nurse's use of the heat lamp in the hospital room, then it is equally obvious that, since the doctor did not order this use, the nurse and her employer, the hospital, had complete control of the instrumentality. In view of this possibility, the trial court could not rule as a matter of law that the hospital did not have "exclusive" control. Who had control depends on what caused the injury, in this view of the case.

Nothing in this opinion is to be taken to indicate that we believe or disbelieve the witnesses of either party. It is not our function to pass upon factual issues. We have found it necessary to discuss the evidence in some detail to show that in several vital respects it was in direct conflict, and that the jury could have rendered a verdict for either party, depending on what facts it had found to have been proven by a preponderance of the evidence. Weighing the evidence is the function of the jury, not of the court.

We conclude, therefore, that the trial court erred in granting a directed verdict for respondent and dismissing the action, and that the judgment must be reversed and the case remanded for a new trial. It is so ordered.

WEAVER, OTT, and HAMILTON, JJ., and JOHNSON, J. Pro Tem., concur.

---

June 8, 1965. Petition for rehearing denied.