VIOLA GORMLEY, Plaintiff and Respondent, v. MONTANA DEACONESS HOSPITAL, Defendant and Appellant.

No. 11132.
Submitted December 13, 1966. Decided January 11, 1967.
Rehearing denied February 21, 1967.
423 P.2d 301.

Smith & Emmons, Great Falls, for appellant.

Alexander, Kuenning & Hall, Great Falls, Paul E. Hoffmann, Glasgow, for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment entered on a special jury verdict which awarded the plaintiff $20,145.36 in damages and which awarded the defendant $3,980.72 on its counterclaim.

The plaintiff-respondent is Viola Gormley and will be referred to as either the plaintiff or Mrs. Gormley. The defendant-appellant is the Montana Deaconess Hospital, a Montana corporation, and will be referred to as the defendant or the hospital.

The plaintiff's action arose out of an injury suffered while a patient at the hospital. The defendant's counterclaim was for services rendered to plaintiff during her stay in the hospital. Although the appeal is from the entire judgment entered by the district court, the defendant has directed its attack at that portion of the trial, verdict, and judgment which deals with plaintiff's recovery.

The defendant makes six specifications of error which raise the following questions:

Whether the district court properly instructed the jury on the doctrine of res ipsa loquitur as it applies to the facts of this case.

Whether the district court erred by instructing the jury that nurses were instrumentalities of the hospital.

The record before this court reveals the following facts: On February 19, 1963, Mrs. Gormley, about sixty years of age, entered the hospital for a vaginal hysterectomy operation. The operation was performed on February 20, 1963, by Dr. H. W. Fuller, who was assisted by Dr. Robert E. Asmussen.

Following the completion of the operation, Mrs. Gormley was returned to her hospital room to begin her post-operative period of recovery. Dr. Fuller saw Mrs. Gormley on the evening of the operation, February 20, and he examined her on the

next morning, February 21. Dr. Fuller found that Mrs. Gormley's recovery during the first 24 hours seemed quite normal but that she did not appear to be fully aware of the circumstances or conditions around her due to the recent anesthesia and drugs given for pain.

About 4:40 p. m. on February 22, 1963, Mrs. Gormley experienced a grand mal seizure. This seizure lasted about three minutes, and it was followed by a second grand mal seizure which occurred approximately fifteen minutes after the first seizure had subsided. When the first seizure began, only Mr. Gormley was in the room with his wife. He immediately summoned help. A nurse, two nurse's aides, and an orderly came to the room. Dr. Asmussen was summoned from his office immediately, and he arrived as the second seizure was beginning. As Dr. Asmussen entered the hospital, he summoned Dr. F. Hughes Crago, a specialist in internal medicine, who arrived very shortly after Dr. Asmussen.

Shortly after the second seizure subsided, Dr. Crago examined Mrs. Gormley in an attempt to determine the cause of the seizure. Dr. Asmussen observed the examination but did not take an active part in this examination. Dr. Crago made another examination of Mrs. Gormley about 9:00 p. m. of the same evening.

Upon the advice of the doctors, special registered nurses were employed to give round the clock nursing care to Mrs. Gormley. This care began around 6:00 p. m. on February 22.

Around 1:00 p. m. on February 23, the special nurse noticed severe swelling and bruises on Mrs. Gormley's right shoulder.

At 8:00 a. m., February 23, Dr. Crago again examined Mrs. Gormley and ordered x-rays taken of Mrs. Gormley's right arm and shoulder. It was subsequently confirmed that Mrs. Gormley had sustained a comminuted fracture of the right humerus.

Dr. Fuller testified that Mrs. Gormley did not have any injury to her arm and shoulder before she entered the operating room or after she came out of the operating room.

Dr. Crago testified that he did not have an opinion as to what caused the fracture. Upon the basis of his examinations of Mrs. Gormley on the evening of February 22, he thought that the injury had to have happened between 9:00 p. m., February 22, and 8:00 a. m., February 23. However, Mrs. Gormley was constantly attended to from the time of her first grand mal seizure until the time Dr. Crago ordered the x-rays to determine the extent of the injuries to her arm and shoulder. No unusual incident happened to her during this time.

Dr. John Wolgamot, a specialist in orthopedic surgery, also had no opinion as to how the injury occurred.

Dr. Ernest Cashion whose practice includes general surgery and neurology and neurological surgery also examined Mrs. Gormley on the evening of the seizures in an attempt to determine their cause. He diagnosed the seizures as of a metabolic type, caused by her hospitalization, surgery, drugs, and possible blood transfusions and not due to the injury which Mrs. Gormley had suffered.

Mr. Gormley testified that he came to his wife's hospital room around 8:30 a. m. on February 22. He stayed until noon and returned about 2:30 p. m. the same day. During the time Mr. Gormley was with his wife, nothing unusual happened to her until she experienced the grand mal seizure at 4:40 p. m.

Mr. Gormley further testified that when he left the hospital at noon, Mrs. Gormley was receiving an intravenous feeding in the right arm. On his return the intravenous feeding was in the left arm. The hospital records indicate that the intravenous feeding was started at 9:55 a. m. and discontinued at 3:00 p. m., but there is no notation of the changing of arms.

The nurses' notes that were kept on Mrs. Gormley while she was a patient in the hospital were introduced in evidence by the plaintiff. The hospital regulations require the registered nurse on duty to administer intravenous feedings and to make initialed or signed notation thereof in the nurses' notes. The nurses' notes for the hours of 7:00 a. m. to 3:00 p. m. on Feb-

ruary 22, 1963, are not signed by any registered nurse. It was never established who the registered nurse was that was on duty that day during those hours.

Mrs. Emma Golie was a student practical nurse employed by the hospital at the time of Mrs. Gormley's hospitalization. The hospital records indicate that she was the only person having charge of Mrs. Gormley from 7:00 a. m. to 3:00 p. m. on February 22. Mrs. Golie testified that it was her recollection that there was no intravenous feeding in the morning and that it was started after lunch. This recollection is not in agreement with the unsigned hospital records as hereinbefore noted.

From the various hospital records and the testimony of other persons who observed Mrs. Gormley during the first few days after her operation, it is apparent that she was in a drugged condition from the time she left the operating room up to the time of the seizure and that for some time after the seizures— at least until the time the injury was discovered by Dr. Crago —she was in a comatose state, unable to make any voluntary movements.

There was ample evidence introduced which showed that Mrs. Gormley was dependent upon the hospital for her care and attention. She had undergone a serious major operation. She was receiving medication to relieve pain. She has no recollection of the events for about a three week period. No testimony was given which would indicate that this inability to recall was an unusual occurrence.

Another important issue that was well covered at the trial was the length of time that would pass before swelling and discoloration would appear on an individual who had experienced this type of injury. At least three doctors gave their opinions as to how long a time it would take before the swelling and discoloration would begin.

Dr. Asmussen testified that the swelling could occur within fifteen minutes and that discoloration could occur at the very least time within two or four hours or longer.

Dr. Crago testified that swelling would appear from one-half hour to two hours after the injury and that discoloration could occur in two, three, four, or five hours.

Dr. Wolgamot said the time in which the swelling and discoloration would appear was a very rough one to estimate and that it could occur roughly between four and forty-eight hours.

The testimony given at the trial shows that no one was able to say how or when the injury to Mrs. Gormley occurred.

It should be noted that at the time the defendant moved for a directed verdict the court admitted there was a complete conflict in the evidence as to when the plaintiff sustained her injuries and expressed the feeling that a special verdict might be required, and also that if the fracture occurred at or after the second seizure the defendant would not be liable. The motion was denied and the court thereafter, without objection, instructed the jury to return a special verdict. In that special verdict the jury found that the plaintiff sustained her fracture prior to the start of her second seizure on February 22, 1963, and further, that the defendant was negligent in its care of the plaintiff and that such negligence was the proximate cause of the plaintiff's injuries.

This brings us to a consideration of the first question raised on this appeal, namely, whether the district court's instructions on the doctrine of res ipsa loquitur were correct.

It has been the defendant's position throughout the entire course of this case—both trial and appellate level—that "The plaintiff must establish the *thing* that caused the injury since the doctrine of res ipsa loquitur permits an inference that the known act that produced the injury was a negligent act it does not permit an inference as to what act did produce the injury * * *." and that various instructions were improper because they did not add this requirement. (Emphasis supplied.)

To preface our discussion we quote from Stocking v. Johnson Flying Service, 143 Mont. 61, 387 P.2d 312, these comments:

"In the commission of certain injuries it is impossible for a

party to prove facts showing negligence, but by common knowledge and experience it is clear that the injury would not have occurred but for the responsible party's negligence. When this situation arises, courts generally apply the doctrine of res ipsa loquitur, or 'the thing speaks for itself.' Maki v. Murray Hospital, 91 Mont. 251, 263, 7 P.2d 228.

*"Res ipsa loquitur* is defined as: 'That when an instrumentality which causes injury, without any fault of the injured person, is under the exclusive control of the defendant at the time of the injury, *and the injury is such as in the ordinary course of things does not occur* if the one having such control uses proper care, then the law infers negligence on the part of the one in control as the cause of the injury.' [Emphasis supplied.] Whitney v. Northwest Greyhound, 125 Mont. 528, 533, 242 P.2d 257; Davis v. Trobough, 139 Mont. 322, 326, 363 P.2d 727.

" 'This doctrine is not an exception to the rule that the burden is on the plaintiff to prove actionable negligence, nor does it permit a recovery on mere proof of the injury; it merely "has the force of a disputable presumption of law and supplies the place of proof necessarily wanting" when the injured party cannot disclose the cause of his injury, but it is apparent prima facie that the accident would not ordinarily have happened had the defendant exercised ordinary care. [Cases cited.]

" 'Further, this doctrine is not, as sometimes said, proof of negligence by a species of circumstantial evidence, the inference to be drawn by the jury from the probability of negligence resting, not upon evidence, direct or circumstantial, but upon a postulate from common experience that accidents of the kind involved do not ordinarily occur in the absence of negligence. [Reference material cited.]' Maki v. Murray Hospital, supra."

Other recent cases in which the court has dealt with res ipsa loquitur include Krohmer v. Dahl, 145 Mont. 491, 402 P.2d 979; Jackson v. William Dingwall Co., 145 Mont. 127, 399

P.2d 236, and Baumgartner v. National Cash Register Co., 146 Mont. 346, 406 P.2d 686. Insofar as they were applicable in these cases we have followed the same criterion set forth in our quotation from Stocking, supra. In our opinion this conception of the doctrine is the majority view, and while we do not wish to unduly extend this opinion on this point we call attention to the annotation "Res Ipsa Loquitur in Action Against Hospital for Injury to Patient," appearing in 9 A.L.R.3d 1315, 1319, for a full discussion of all aspects of this doctrine. It is therein stated by the author of the annotation that: "The traditional conditions to applicability of the res ipsa doctrine in a given case, or, as they are sometimes called, the traditional 'elements' of the rule—namely, defendant's control of the injury-producing instrumentality, the unusualness of the occurrence in the absence of negligence, superior knowledge on the part of the defendant as to the cause of the injury, and, at least in some jurisdictions, absence of voluntary action on the part of the injured person—are all applicable in actions against a hospital for injury to a patient." In our view these traditional "elements" are all present here.

The same elements are stated in different language by the Washington Supreme Court in Leach v. Ellensburg Hospital Association, 65 Wash.2d 925, 400 P.2d 611, 9 A.L.R.3d 1303, in these words:

"* * * In a recent decision by this court, the doctrine of res ipsa loquitur as it applies to hospitals was summarized and discussed. In Horner v. Northern Pacific Beneficial Ass'n Hospitals, Inc., 62 Wash.2d 351, 359, 382 P.2d 518, 523 (1963), this court said: 'Further proof of negligence is not essential to take a case to the jury or to overcome challenges to the sufficiency of the evidence where (1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendent, and (3) the injury-causing accident or occur-

rence is not due to any voluntary action or contribution on the part of the plaintiff. * * *' "

Instructions No. 26 and 28 contain the elements which the plaintiff had the burden of proving. We will set forth the portions of Instructions No. 26 and 28 which cover each of the elements outlined by the Washington court.

Element (1) is covered by Instruction No. 26, subsection 6, and Instruction No. 28, subsection 3, which read: "That such injuries do not happen in the ordinary course of things had the defendant hospital used ordinary care under the circumstances." and "That such injuries do not happen in the ordinary course of things when the person who has control uses ordinary care under the circumstances."

Element (2) is covered by Instruction No. 26, subsections 1 and 7 and Instruction No. 28, subsection 2, which read: "That plaintiff following said operation was under the exclusive care and control of defendant hospital, its nurses, servants, guards and employees" and "That she sustained the damages she has alleged, as a proximate cause of defendant hospital's failure to look after, guard or care for her." and "That some certain instrumentality by which her injuries were proximately caused was in the possession and under the exclusive control of defendant hospital at the time the injuries were sustained; nurses, servants, guards and employees are to be regarded as instrumentalities."

Element (3) is covered by Instruction No. 26, subsection 2, which reads: "That following said operation she was so incapacitated in mind and body by reason of anaesthesia, drugs or sedatives as to be unable to care for herself and to be unaware of her action."

The plaintiff bore the burden of proving each of these elements. The plaintiff was not required to establish the THING that caused the injury. If such a requirement were added to this case, plaintiff would not be able to recover although it was shown that she suffered an injury while a patient

in the hospital. Common sense tells us that such an injury cannot take place without negligence on someone's part. Thus, the main issue at the trial was who was responsible for the injury. The doctrine of res ipsa loquitur is simply the conduit by which the plaintiff gets her case to the jury on this question of negligence. The doctrine leaves it up to the jury to decide the question of who was negligent. The defendant was given the opportunity to present its testimony to refute plaintiff's contentions that the hospital was negligent. In this case defendant simply was not successful in explaining to the jury how the injury could occur without negligence on its part.

The district court's instructions on res ipsa loquitur as it applies to the facts of this case were correct.

We come now to a consideration of whether nurses were instrumentalities of the hospital in this case.

We believe that the position of the nurse in cases similar to the instant case has been discussed by previous decisions of this court. The nurse can be an agent or employee of the hospital, Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228, Davis v. Trobough, 139 Mont. 322, 363 P.2d 727, or of a doctor, Simons v. Northern Pacific Ry. Co., 94 Mont. 355, 22 P.2d 609. The nurse can even be a completely independent contractor. But the facts of each case decide the nurse's position. We would be closing our eyes to reality if we were to rule that the ordinary nurse, hired by the hospital, paid by the hospital, assigned to certain patients by the hospital, and generally responsible to the hospital to obey its rules and regulations is not an employee or agent of the hospital. Such is simply not the case. Nurses such as we have described here, working on the floor of the hospital are employees of the hospital and come under the doctrine of respondeat superior.

By making this ruling, we do not rule out cases where it can be clearly shown that the nurse is an agent of some person or party other than the hospital. We simply hold that in this case the hospital failed to show that its regular nursing staff

was responsible to any person or party other than itself for the care and attention of Mrs. Gormley.

We find no error in the instruction of the district court in regard to including nurses as instrumentalities of the hospital on the basis of the facts presented in this case.

We have carefully considered each specification of error and find them all without merit.

Finding no error, we affirm the judgment appealed from.

MR. JUSTICES ADAIR, DOYLE, JOHN CONWAY HARRISON and CASTLES, concur.