[No. 33435. Department One. February 23, 1956.]

EVERETT HUTTNER et al., Appellants, v. HUNTER J. MACKAY et al., Respondents.[1]

[1]Reported in 293 P. (2d) 766.

*Reischling & Chan,* for appellants.

*Eggerman, Rosling & Williams,* for respondents.

OTT, J.—This is a malpractice action.

In 1946, plaintiff Everett Huttner suffered a generalized convulsion, and his condition was diagnosed as a low level of epilepsy. In 1947, he suffered another convulsion of the same type. In October, 1949, he contracted a cold, which was accompanied by severe headaches. Thereafter, he suffered diplopia (double vision) in one eye and consulted an ophthalmologist, who made an examination of his eyes and changed the lenses in his glasses. When the diplopia continued, the doctor sent him to consult an eye, ear, nose, and throat specialist. This doctor reported that the trouble did not stem from the ears, nose, or throat. Mr. Huttner was then referred to Dr. Paul G. Flothow, a neurosurgeon

(now deceased). Dr. Flothow referred him to his associate, Dr. Hunter J. MacKay, a neurosurgeon, since Dr. Flothow was not one of the Medical Service Bureau doctors.

December 20, 1949, Dr. MacKay and Mr. Huttner talked for about an hour, during which time the doctor-patient relationship was agreed upon, and Mr. Huttner gave Dr. MacKay a history of his subjective symptoms. The history included a negative Wasserman test, in addition to the facts hereinbefore related. An electroencephalogram was taken which indicated that there was some generalized cerebral dysfunction, with a grade two focal lesion in the right frontal lobe. Dr. MacKay testified that his examination on December 20, 1949, also disclosed an incipient choked disk in the right eye, and that X rays taken earlier in December by another doctor showed a normal skull.

December 30, 1949, a pneumoencephalogram was performed. During this diagnostic study, the manner in which the fluid flowed from the spinal canal indicated that Mr. Huttner had high intracranial pressure. The X rays taken were negative. January 4, 1950, a ventriculogram was performed. The roentgenologist reported that these X rays were negative. However, Dr. MacKay testified that the X rays confirmed his clinical diagnosis that Mr. Huttner was suffering from a deep-seated brain tumor in the right frontal temporal area. On the same day, Dr. MacKay and Dr. Flothow performed a craniotomy.

During this operation, they cut a portion of Mr. Huttner's skull. When the bone was laid back, approximately fifteen square inches of the dura was exposed. The surgeons put several "nicks" in the dura and inserted a canula in different places in an attempt to locate the tumor. When the doctors did not locate the tumor in this manner, they incised the dura. Because of the intracranial pressure, this incision allowed the brain to herniate through the opening in the skull. The herniation was in the general area of the motor-sensory cortex. Thereafter, the doctors cannulated further, but could not reach the tumor. They closed the opening, leaving the skull flap slightly raised in order to compensate for the intracranial pressure. The damage resulting from

the herniation caused paralysis of Mr. Huttner's left side. He was discharged from the hospital on February 16, 1950. Thereafter, on several occasions, the patient was seen by Dr. MacKay in his office. The doctor prescribed certain medicines during these calls, and over the telephone.

In the latter part of January, 1951, Mr. Huttner was in Harborview Hospital with pneumonia. While there, he was visited by Dr. Arthur A. Ward, a neurosurgeon, who became interested in Mr. Huttner's condition. February 9, 1951, Dr. Ward completed an extensive diagnostic examination. His testimony at the trial did not indicate that his diagnostic studies revealed the exact location of the tumor or whether it was operable. He received permission to perform an exploratory operation. He operated through the same opening in the skull as had Dr. MacKay. After incising the cortex, he discovered a tumor in the base of the right ventricle and removed a small piece of it. This operation resulted in decreased intracranial pressure, thus permitting the herniated portion of the brain to recede so that the skull flap could be replaced in its normal position. On April 20, 1951, Dr. Ward performed a second craniotomy. This time he operated from a different angle, approached the tumor from the bottom, and removed another piece of it.

May 11, 1951, a third operation was performed, whereby tubes were inserted so that the excess fluid around the brain could drain through the ears and throat into the stomach, where it would be reabsorbed.

Although the operations performed by Dr. Ward relieved the pressure on Mr. Huttner's brain, the doctor testified that the tumor was inoperable and could not be completely removed, and that the operations were palliative only and did not correct the paralysis.

December 30, 1952, the plaintiffs commenced this action against Dr. Hunter J. MacKay and Dr. Paul G. Flothow (who died before the cause came to trial), alleging negligence in the diagnosis, in the performance of the operation, and in the postoperative care. A trial before a jury commenced December 6, 1954. At the close of plaintiffs' case,

the defendants interposed a challenge to the sufficiency of the evidence. The court sustained the challenge and dismissed the action. The plaintiffs have appealed.

The appellants' first assignment of error is directed to the court's sustaining the challenge to the sufficiency of the evidence.

This court is committed to the rule that, in cases being tried to a jury, a challenge to the sufficiency of the evidence admits the truth of the opposing party's evidence and all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the party against whom the motion is made. *Parish v. Ash,* 32 Wn. (2d) 637, 203 P. (2d) 330 (1949); *Hutton v. Martin,* 43 Wn. (2d) 574, 262 P. (2d) 202 (1953). See, also, *Richards v. Kuppinger,* 46 Wn. (2d) 62, 278 P. (2d) 395 (1955).

In *Skodje v. Hardy,* 47 Wn. (2d) 557, 288 P. (2d) 471 (1955), we said:

"A physician or surgeon is negligent only if he fails to exercise that degree of care, diligence, and skill which is ordinarily possessed and exercised by members of the medical profession in the same or a similar locality. . . . the evidence tending to establish such negligence must be based upon medical testimony."

The exception to the rule that medical testimony is required to establish such negligence is when the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. *Woods v. Pommerening,* 44 Wn. (2d) 867, 271 P. (2d) 705 (1954). A wrong diagnosis is not actionable unless (1) it was the result of negligence, and (2) it was followed by improper treatment, to the injury of the patient. *Peddicord v. Lieser,* 5 Wn. (2d) 190, 105 P. (2d) 5 (1940); *Skodje v. Hardy, supra.*

Was there sufficient medical evidence to establish negligence? Appellants' medical witness testified as follows:

"Q. Now, doctor, assuming that a neurosurgeon had made a tentative diagnosis of a cerebral lesion existing in the right frontal temporal area of the brain, such tentative

diagnosis having been based upon subjective symptoms, objective symptoms, and an EEG, would it be in accord with the recognized and applicable standard of neurosurgeons practicing their speciality in the City of Seattle to make further diagnostic studies for the purpose of confirming the tentative diagnosis theretofore made? . . . A. It would be standard for a neurosurgeon to confirm his clinical impression by further studies. . . . Q. Now, would it not then, doctor, be a departure from that recognized and applicable standard for a neurosurgeon in Seattle to perform an operation for the removal of a suspected lesion, without such further diagnostic procedure to more definitely determine and locate a suspected lesion by means of a pneumoencephalogram or ventriculagram? . . . A. I would think it would be necessary to have the confirming evidence from one of these types of x-ray studies. Q. And if he did not do that, would that not be a departure from the recognized standard? A. Yes, unless there were very clear-cut clinical evidence of the location of the lesion."

Dr. MacKay performed a pneumoencephalogram and a ventriculagram after his clinical diagnosis. According to Dr. MacKay's testimony, the pneumoencephalogram X rays were of no diagnostic value. The X rays taken as part of the ventriculagram process were, according to the report of the roentgenologist and the testimony of Dr. Ward, also negative.

Considering the evidence in the light most favorable to the appellants, Dr. MacKay had no X rays to confirm his tentative clinical diagnosis and, therefore, in accordance with the standard of neurosurgeons in the community, should have taken further X rays to confirm his diagnosis.

Dr. MacKay testified that, according to his diagnosis, there was a tumor in the right frontal temporal region. Dr. Ward, who ultimately located the tumor in the process of his operation, testified as follows:

"Q. From the knowledge you gained by operating upon Everett Huttner, where was this tumor located? A. . . . The tumor was located in the anterior part of the cerebral hemisphere. It was arising from a structure which lies in the floor of the frontal horn of the lateral ventricle, known as the caudate nucleus. Q. Right lateral— A. Right lateral ventricle. It was growing up into the cavity of the ventricle

from this structure. It had grown through the foramen of Monro, which is the passage from the right lateral ventricle to the third ventricle. It had also descended deep into the frontal lobe at that point, and was presenting itself at the base of the brain in the right frontal region, where it partially surrounded some of the large blood vessels at the base of the brain. Q. Doctor, was its location within this description: right frontal temporal area? A. Not from an anatomical standpoint, no. Q. In the light of hind-sight, you mean? A. As seen at the time of operation. Q. I see. Is the area which you have described a vital area? A. It is. Q. Was the tumor located as you have described it an operable tumor? A. It was not. Q. By that I mean could it be entirely removed? A. It could not."

Thus, appellants' medical testimony disclosed that Dr. MacKay did not conform to the standard of neurosurgeons in the community with regard to diagnostic tests. However, Dr. MacKay's diagnosis was correct, in that, at the time he operated, Mr. Huttner had a brain tumor. Further tests, if properly made, would have confirmed this part of the diagnosis.

Dr. Ward discovered the exact location of the tumor, not by his diagnosis, but by his operation. His testimony does not disclose that his diagnostic procedure revealed the exact location of the tumor with any more certainty than did Dr. MacKay's. Dr. Ward did not know the exact position of the tumor except "as seen at the time of operation."

There is no medical testimony establishing that, had Dr. MacKay made further tests, he would have been able to locate the tumor more specifically than he had when he operated. We hold that there was no actionable negligence proved with reference to the diagnosis.

There was no medical testimony that Dr. MacKay was negligent in performing the craniotomy. Dr. Ward testified that, to achieve decompression, there were five accepted methods of operation, one of which was used by Mr. Mac-Kay. Although there was testimony that none of the other methods would have caused paralysis, there was no evidence that the method used by Dr. MacKay was a departure from accepted practice.

Brain surgery is an intricate and complicated process, and medical testimony is necessary to establish a departure from the accepted practice in such operations. Since there is no testimony that Dr. MacKay's method of operation was not accepted practice among neurosurgeons in the community, and no testimony that the operation was not properly performed, negligence was not established with regard thereto.

Was there postoperative negligence? What constitutes proper care of a patient after a neurosurgical operation must be established by medical testimony. Dr. MacKay prescribed certain medicines for his patient postoperatively. There is no medical evidence that the medicine prescribed for the patient, under the circumstances of this case, was contrary to the accepted practice in the community. Neither is there any testimony that the accepted practice in the community required further care or surgery. Without such testimony, postoperative negligence was not established.

We find no merit in appellants' first assignment of error.

Appellants assign as error the exclusion of certain testimony by Dr. Ward upon the issue of negligence in performing a craniotomy with an insufficient diagnosis. The question to which the objection was sustained was: "In your opinion on the basis of that evidence, would it be bad practice for a neurosurgeon to perform a craniotomy?"

The material issue in this case is not whether, in the opinion of the witness, the doctor's conduct was good or bad practice, but whether it conformed to the accepted practices of the neurosurgeons in the city of Seattle in 1949 and 1950. There is no merit in this assignment of error for the reason that the answer to the question, as phrased by the appellants, was immaterial.

Error is predicated upon the exclusion of Dr. Ward's answer to the following question:

"Now, again, I say if a neurosurgeon had diagnosed a suspected lesion as lying within the right frontal temporal area of the brain, and assume that the red line, which is placed on this chart by Dr. Johnson, properly shows the right

frontal temporal area, would it be necessary in performing a craniotomy to reach a suspected lesion within that area . . . to uncover the area of the skull or of the brain, which covers the pre-central and post-central gyri?"

Dr. Ward testified that to leave a large bone flap in this area was accepted practice in 1949 and 1950, and that, when he performed his operation, he used the same opening as had Dr. MacKay. Whether it was *necessary* to uncover this part of the brain was not before the court. The court was concerned only with evidence of a departure from the accepted practice. The answer to the question, as phrased, was immaterial, and, further, in the light of Dr. Ward's testimony, the exclusion of this evidence was not prejudicial.

Error is directed to the exclusion of Dr. Ward's testimony on the probability of removal of the tumor on January 4, 1950, without paralysis, had it been more specifically located.

The exclusion of this testimony was proper for two reasons, (1) there was no medical evidence that the tumor could have been located more specifically before Dr. MacKay operated, and (2) the exclusion was not prejudicial in that Dr. Ward testified, on cross-examination, that he was not familiar with the situation as it was presented to the surgeons prior to January 4, 1950, and that he could not make an unequivocal statement as to whether the tumor could have been removed at that time.

Error is assigned to the exclusion of the testimony of an anatomist upon the issue of negligence in invading certain portions of the brain.

This evidence was properly excluded. The anatomist was not a neurosurgeon practicing in Seattle in 1949 and 1950. Since he was not a neurosurgeon and did not practice in the community, and there was no showing that he was familiar was the accepted practices of neurosurgeons in the performance of craniotomies, he was not qualified to express an opinion upon whether a neurosurgeon was negligent in such operations.

Error is assigned to the trial court's denial of appellants' motion to amend their complaint to conform with the proof.

The testimony established that a craniotomy had been authorized. However, Mrs. Huttner testified that she had not authorized an exploratory craniotomy.

Dr. MacKay did not testify that he performed an exploratory operation for diagnostic purposes. He used the term "exploratory" generally, in that, in his opinion, all operations are exploratory because the practice of medicine is not an exact science. He testified that, from his diagnosis, he concluded that the tumor was located in the right frontal temporal region, but that the operation disclosed that it was too deep-seated for removal. He admittedly was authorized to remove the tumor. The evidence established that its exact location, or if it was operable, could be determined only by a craniotomy such as Dr. MacKay performed.

Where a doctor is authorized to remove a tumor by means of a craniotomy and finds, during the operation, that it cannot be removed without grave risk to the life of his patient, the authority to remove the tumor carries with it the implied authority not to do so when death would be a most probable result. The doctor performed the operation authorized, and the trial amendment was properly denied.

The issues raised by assignments of error Nos. 2, 3, and 9 are without merit for the reasons above indicated and discussed.

The judgment is affirmed.

HAMLEY, C. J., MALLERY, SCHWELLENBACH, and DONWORTH, JJ., concur.

May 16, 1956. Petition for rehearing denied.