[No. 38184. En Banc. September 21, 1967.]

DOROTHY H. PEDERSON, *as Guardian, Appellant,* v. M. L. DUMOUCHEL, *et al., Respondents.**

*Reported in 431 P.2d 973.

74

*Charles R. Johnson* (of *Gordon, Sager, Honeywell, Malanca & Peterson*), for appellant.

*Parker & Parker, Stanley J. Krause,* and *Lester T. Parker,* for respondents Heikel.

*Comfort, Dolack, Hansler & Billett,* for respondent St. Joseph Hospital.

WEAVER, J.—Plaintiff, as guardian ad litem of Larry C. Neal, a minor, appeals from a judgment, entered after a jury verdict for defendants, dismissing this action with prejudice. We refer to the minor as plaintiff; he reached his majority before trial.

This is an action for damages allegedly arising from medical malpractice. It is against M. L. Dumouchel, a medical doctor; Walter D. Heikel, a dentist; and St. Joseph Hospital, a corporation, in Aberdeen, Washington.

Plaintiff was injured in an automobile accident in the early morning of June 6, 1961. He was placed in St. Joseph Hospital under the care of Dr. M. L. Dumouchel, who first saw him at 8 a.m. After treatment of minor injuries, it was determined that plaintiff had a fractured jaw. Dr. Dumouchel associated Dr. Heikel, a dentist, to reduce plaintiff's fractured jaw under general anesthetic in surgery at the hospital. Dr. Dumouchel, who examined plaintiff prior to surgery, testified, in his opinion, plaintiff did not have any "gross or even minor brain injury."

The operation commenced at 10:20 a.m. the next day, June 7, 1961, and was concluded at noon. Anesthetic was administered by a nurse employed by the hospital. Dr. Heikel, the dentist, testified that he had no working knowledge of the use or administration of a general anesthetic and had left the responsibility and control of the anesthetic to the nurse. Neither Dr. Dumouchel nor any other medical doctor was present in the surgery. Dr. Heikel testified that on 11 prior occasions, when he had reduced a fractured jaw under a general anesthetic in the hospital, a medical doctor had been present; that on only one prior occasion a medical doctor had not been present.

Dr. Dumouchel left the hospital before surgery commenced. Shortly after noon and while in the recovery room, plaintiff suffered convulsive seizures. Dr. Dumouchel could not be located; it was his "afternoon off." No medical doctor was available in the hospital at the time.

About 1:30 p.m. a nurse from the surgical floor located Dr. John D. Fletcher, a surgeon, who was then visiting his patients in the hospital. He examined plaintiff, found him unconscious and experiencing convulsive seizures. Dr. Fletcher performed a spinal tap "to determine the interspinal pressure and to determine whether there is any gross blood in the spinal fluid." The spinal tap was essentially normal.

Concluding that plaintiff was suffering "some type of brain injury," Dr. Fletcher consulted Dr. Lawrence Knopp, a neurosurgeon at St. Frances Cabrini Hospital in Seattle. They decided that plaintiff should be removed to Seattle at once.

As plaintiff was being taken to the ambulance about 4:30 p.m., Dr. Dumouchel returned to the hospital and learned for the first time that plaintiff was still unconscious and having seizures.

Dr. Knopp and Dr. William Sata, a neurologist of Seattle, treated plaintiff in the Seattle hospital during the period of nearly a month that he was unconscious following surgery.

The nurse anesthetist testified that she had been a narcotic user from 1958 or 1959 until the month before the surgery. To replace narcotics, she commenced drinking alcohol. August 4, 1961, she was committed to Western State Hospital where she was a patient for 7 months. At the trial she had a bare minimum of independent recollection and relied almost entirely on the anesthesia chart to describe what had transpired in surgery on June 7, 1961. The nurse was hired and paid by the hospital; the hospital billed the patient for her services.

For the purpose of this opinion, it is sufficient to state that the record contains competent, expert, medical testimony, if believed by a jury, to support the conclusion

that plaintiff suffered severe and permanent brain damage from cerebral anoxia or hypoxia (complete or partial deprivation of oxygen to the brain) while he was anesthetized during surgery, and that cerebral anoxia or hypoxia was due to inadequate ventilation of the patient during the anesthesia or postoperative period.

Plaintiff's 14 assignments of error present 4 major questions of law:

1. The correctness of the instructions of the trial court concerning the standard of care applicable to doctors, dentists, and hospitals.

2. The failure of the trial court to give a requested instruction on the doctrine of res ipsa loquitur.

3. The correctness of hypothetical questions asked.

4. Alleged improper argument of defense counsel.

### Instructions on Standard of Care
### As To Doctors and Dentists

Plaintiff's first seven assignments of error are directed to instructions given; they relate to the standard of care that doctors, dentists, and hospitals must meet. The eighth assignment is directed to the court's refusal to give requested instruction No. 7, which embodies plaintiff's theory of the standard of care that should have been applied.

It would unduly extend this opinion to set forth all the questioned instructions verbatim; however, the nub of the problem is expressed in instruction No. 7, wherein the following language is used:

> The standard, I remind you, was set by the learning, skill, care and diligence ordinarily possessed and practiced by others in the same profession in good standing, engaged in like practice, *in the same locality or in similar localities*, and under similar circumstances and at the same time. (Italics ours.)

The same thought (italicized above) is threaded through each of the standard-of-care instructions as they apply to doctors, dentists, and hospitals.

We find some conflicting language in Washington cases concerning the scope or area qualifications of the standard

of care applicable to medical doctors. Cases in the first group refer to the standard "in the same community" or "in the locality where he practices."[1] Cases in the second group refer to the standard of care "in the same or similar communities."[2]

Each line of decisions appears to have overlooked the other; although as early as 1913 this court said in a malpractice case:

> The instruction is faulty, in that it makes the standard of treatment that of the locality alone in which the appellant was practicing; whereas, the true standard is that of all similar localities. *Cranford v. O'Shea*, 75 Wash. 33, 134 Pac. 486 (1913).

The original reason for the "locality rule" is apparent. When there was little intercommunity travel, courts required experts who testified to the standard of care that should have been used to have a personal knowledge of the practice of physicians in that particular community where the patient was treated. It was the accepted theory that a doctor in a small community did not have the same opportunities and resources as did a doctor practicing in a large city to keep abreast of advances in his profession; hence, he should not be held to the same standard of care and skill as that employed by doctors in other communities or in larger cities. Parenthetically, we note that the law of this jurisdiction has never recognized a difference in the professional competency of a lawyer in a small community from that of the professional competency required of a lawyer in a large city.

The "locality rule" had two practical difficulties: first, the scarcity of professional men in the community who

[1]*Kaiser v. Suburban Transp. System*, 65 Wn.2d 461, 464, 398 P.2d 14, 401 P.2d 350 (1965); *Richison v. Nunn*, 57 Wn.2d 1, 5, 340 P.2d 793 (1959); *Cochran v. Harrison Memorial Hosp.*, 42 Wn.2d 264, 267, 254 P.2d 752 (1953); *Derr v. Bonney*, 38 Wn.2d 678, 682, 231 P.2d 637, 54 A.L.R.2d 193 (1951).

[2]*Stafford v. Hunter*, 66 Wn.2d 269, 271, 401 P.2d 986 (1965); *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 387 P.2d 527 (1963); *Huttner v. MacKay*, 48 Wn.2d 378, 383, 293 P.2d 766 (1956).

were qualified or willing to testify about the local standard of care; and second, the possibility of a small group, who, by their laxness or carelessness, could establish a local standard of care that was below that which the law requires. The fact that several careless practitioners might settle in the same place cannot affect the standard of diligence and skill which local patients have a right to expect. Negligence cannot be excused on the ground that others in the same locality practice the same kind of negligence. No degree of antiquity can give sanction to usage bad in itself.

Broadening the rule to include "similar localities" or "similar communities" alleviated, to a certain extent, the first practical difficulty of the "locality rule"—additional witnesses might be available; but it did little to remove the deficiencies springing from the second.

In *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 387 P.2d 527 (1963), this court approached modifying the "similar locality" rule, for it upheld the admission of expert testimony by a Portland, Oregon doctor in a malpractice action arising in Longview, Washington. The court took judicial notice that Longview and Portland are approximately 50 miles apart. We take further judicial notice that they are not "similar localities or similar communities." It was not necessary for the court to examine the rule, however, for the Portland doctor testified he was familiar with the standards of general practitioners in the vicinity of Portland *and Longview*.

Now there is no lack of opportunity for a physician or surgeon to keep abreast of the advances made in his profession and to be familiar with the latest methods and practices adopted.

> The comprehensive coverage of the Journal of the American Medical Association, the availability of numerous other journals, the ubiquitous "detail men" of the drug companies, closed circuit television presentations of medical subjects, special radio networks for physicians, tape recorded digests of medical literature, and hundreds of widely available postgraduate courses all serve to keep physicians informed and increasingly to establish nation-

wide standards. Medicine realizes this, so it is inevitable that the law will do likewise. D. Louisell and H. Williams, The Parenchyma of Law 183 (Professional Medical Publications, Rochester, N. Y. 1960).

■ We have found no better statement of existing conditions. The "locality rule" has no present-day vitality except that it may be considered as *one* of the elements to determine the degree of care and skill which is to be expected of the average practitioner of the class to which he belongs. The degree of care which must be observed is, of course, that of an average, competent practitioner acting in the same or similar circumstances. In other words, local practice within geographic proximity is one, but not the only factor to be considered. No longer is it proper to limit the definition of the standard of care which a medical doctor or dentist must meet solely to the practice or custom of a particular locality, a similar locality, or a geographic area.

The "locality rule" has never been suggested in any English case. (Nathan, Medical Negligence (Butterworth & Co., Ltd. 1957), p. 21.) In England, the same standard is applicable throughout the country. The extent of our country is such, however, that we hesitate to fix a definite geographic limit upon the standard of care—be it statewide or expanded to the Pacific Northwest, as suggested by plaintiff's requested instruction.

A qualified medical or dental practitioner should be subject to liability, in an action for negligence, if he fails to exercise that degree of care and skill which is expected of the average practitioner in the class to which he belongs, acting in the same or similar circumstances. This standard of care is that established in an area coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the patient. The instant case is a good example: plaintiff was taken almost immediately from Aberdeen to Seattle, a distance of 110 miles.

We conclude, therefore, that plaintiff's assignments of error to the instructions given are well-taken, and plaintiff

is granted a new trial against Dr. Dumouchel and Dr. Heikel. We do not approve plaintiff's requested instruction No. 7, however, for it would permit the jury to substitute its judgment, disregarding medical testimony.

### Instructions on Standard of Care as to Hospitals

Much that we have said also applies to the jury instructions given concerning hospitals. They, too, are members of national organizations and subject to accreditation. We appreciate, however, that in addition to administrative supervision, they are also governed by physical facilities that influence their accreditation.

■ Whether a hospital is accredited or not (and defendant hospital is accredited), we conclude that it is negligence as a matter of law for a hospital to permit a surgical operation upon a patient under general anesthetic without the presence and supervision of a medical doctor in the operating room, in the absence of extraordinary and emergent circumstances.

Our conclusion is fortified by the fact that the hospital permitted the breach of one of its own rules.

> Patients requiring dental service may be coadmitted by a member of the medical staff and a local dentist who is qualified, legally, professionally and ethically to practice here. The former shall perform an adequate medical examination prior to dental surgery, and be responsible for the patient's medical care. Rule and Regulation No. 5 of St. Joseph Hospital, p. 16.

Dr. Dumouchel did not assume the responsibility "for the patient's medical care" while in surgery.

The judgment dismissing this action against the hospital is reversed, and the case is remanded for a new trial limited to a determination of whether the hospital's negligence was a proximate cause of plaintiff's injury, if any, and if so, the amount of damages.

### Res Ipsa Loquitur

Although error is assigned to instruction No. 22, which relates to proof of facts by either direct or circumstantial

evidence, counsel admit that it is correct as an abstract statement of the law. Plaintiff's requested instruction No. 13 (refused) also relates to proof of facts by either direct or circumstantial evidence, but has added to it a paragraph instructing the jury on the doctrine of res ipsa loquitur. The paragraph provides:

The rule is that when an agency or instrumentality which produces injury is under the control of certain defendants or their agents, and the injury which occurred would ordinarily not have resulted if those in control had used proper care, then, in the absence of satisfactory explanation, you are at liberty to infer, though you are not required to so infer, that the defendants or their agent, were at some point negligent, and that such negligence produced the injury complained of by the plaintiff.

A case in which the doctrine of res ipsa loquitur applies is a circumstantial-evidence case. In it, the jury is permitted to infer negligence from a result which ordinarily would not have been reached unless someone was negligent. The jury may make the inference of negligence or it may refuse to do so. *Vogreg v. Shepard Ambulance Serv.,* 47 Wn.2d 659, 289 P.2d 350 (1955).

*Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wn.2d 351, 382 P.2d 518 (1963), from which the requested instruction is taken, declares:

Granting exclusive control of the instrumentality and eliminating voluntary participation or contribution by respondent to the acts producing the injury, we feel that negligence may then be inferred in three situations without affirmative proof thereof: (1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.,* leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.

This case falls within both the second and the third category. Not to awaken from a general anesthetic for al-

most a month, and then with apparent brain damage is so extraordinary an occurrence within the general observations of mankind as to raise an inference of negligence.

As to the third category, there is definite, expert opinion testimony from which it can be inferred that plaintiff's injury was the result of negligence. True, the argument is advanced that plaintiff had been in a serious automobile accident. At best, however, this only presents a jury question; for plaintiff was not operated upon for almost a day and a half after the accident. His own doctor, a defendant in this action, testified that prior to surgery plaintiff did not have any "gross or even minor brain injury."

The facts and the permissible inferences therefrom are sufficient, if believed by the jury, to support plaintiff's theory of the case. We conclude that plaintiff's requested instruction No. 13 should have been given. To say more would expose us to the charge of "overwriting and over-talking about the same subject" for it has been so well said in *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc., supra,* and in *Leach v. Ellensburg Hosp. Ass'n,* 65 Wn.2d 925, 400 P.2d 611, 9 A.L.R.3d 1303 (1965).[3]

Since the requested instruction permits the jury to *infer* negligence in the absence of a satisfactory explanation in the circumstances of this case, defense counsels' constant argument that the plaintiff must prove something went wrong in surgery before there is any right to recover becomes inappropriate.

### Hypothetical Questions

First, plaintiff urges that the trial court erred when it permitted hypothetical questions to be propounded to defense witnesses concerning the standard of care in Grays Harbor county relative to the practice of having medical doctors in attendance when a surgical procedure is done

---

[3]See also annotations: Physicians and surgeons, res ipsa loquitur, or presumption or inference of negligence, in malpractice cases, 162 A.L.R. 1265 (1946), 82 A.L.R.2d 1262 (1962); Res ipsa loquitur in action against hospital for injury to patient, 173 A.L.R. 535 (1948), 9 A.L.R.3d 1315 (1966).

under a general anesthetic by a dentist. We agree. The questions were too broad. They should have been limited to the particular procedure, the reduction of a fractured jaw.

Second, plaintiff assigns error to a long and complicated hypothetical question that assumes plaintiff's higher brain functions were unimpaired, as determined by psychological tests, but that some of his visual motor functions were impaired, "indicating brain stem damage of a localized nature." We find in the record testimony of expert witnesses to support both assumptions, so the question was not objectionable.

### Inappropriate Conduct of Counsel

The die of this case has already been cast; it must be retried. Plaintiff, however, makes a cogent argument that local defense counsel became overly enthusiastic in defense of their local community. Plaintiff and his guardian ad litem do not live in Aberdeen; they live in Raymond; their lawyers are from Pierce County; most of their expert witnesses are from counties other than Grays Harbor. In the spirit of good advocacy, counsel for defendants overlooked none of this. After a minute review of the record, we agree with plaintiff.

The trial was a long one (1467 pages of testimony). It was extremely hard fought. Neither side monopolized the low blows. Again we agree with plaintiff that "from voir dire examination to closing argument, defense counsel made a calculated appeal to local pride and prejudice."

It would unduly burden this opinion to quote the many occasions when defense counsel attempted to turn the jury into a hometown rooting section. Counsel wrung out every tear in the towel. To illustrate, one of defense counsel argued:

> This is a serious case for all of the parties involved. I just wonder what would happen tomorrow if I went out with some friend and got drunk and ran off the road and hit a stump and broke my jaw, split my head open, scalp open, and went to the hospital and said: "Doctor so-and-so, the dentist, I would like you to come up and wire my jaw." He would probably tell me: "Go see Dr. Sata in

*Seattle.* I am not going to take a chance on being sued for half a million dollars to come up and wire your jaw. If you don't have good luck with Dr. Sata, then go see Mr. Johnson in *Tacoma* and he will bring a law suit for you to recover damages. (Italics ours.)

■ We do not approve of arguments such as this. A case should be argued upon the facts without an appeal to prejudice.

The judgment of dismissal is reversed, and the case is remanded for a new trial.

Costs will abide the final determination of this action. ROA 55(a)(1), RCW vol. 0.

It is so ordered.

FINLEY, C. J., HILL, DONWORTH, ROSELLINI, HUNTER, HAMILTON, and HALE, JJ., concur.

---

December 1, 1967. Petition for rehearing denied.