**Laura L. HAAS et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 75–4110–K.**

United States District Court, D. Massachusetts.

June 5, 1980.

Enid M. Starr, Barron & Stadfeld, Boston, Mass., Richard C. Driscoll, Jr., Driscoll & Mattingly, Brockton, Mass., for plaintiffs.

James J. O'Leary, Newburyport, Mass., for defendant.

## MEMORANDUM

KEETON, District Judge.

### I.

This case is before the court on defendant's Motion for Summary Judgment.

Plaintiff Laura L. Haas, individually and as guardian of her husband, Julius Haas, brought this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and §§ 2671 et seq. In Count I plaintiff seeks to recover

for grievous and totally incapacitating personal injuries sustained by Julius Haas as a result of an anoxic episode during which his brain was deprived of oxygen while he was under knee surgery at the West Roxbury Veterans Hospital on October 12, 1971. In Count II plaintiff seeks to recover individually for her damage resulting from the injuries to her husband. In both counts, the alleged basis of liability is negligence of employees of defendant, within the scope of their employment in the performance of medical and nursing care.

After extensive, contested discovery proceedings, this case was called for pre-trial conference on October 31, 1979, at which time the parties advised the court that the principal contested issue on liability arises from plaintiff's contention that, by application of the principle of res ipsa loquitur, plaintiff will have proved that the injuries resulted from negligence of defendant's servants in the administration of anesthesia upon proving that "prior to the administration of an anesthesia for the operation on his knee on or about October 12, 1971, the patient Julius Haas was in excellent physical condition and health except for the injury" and after the operation he was found to have sustained severe and permanent injuries because his brain was deprived of oxygen while he was under the care of the defendants for the operation on his knee. Plaintiff's Pre-Trial Memorandum, paragraphs 3, 4. Plaintiff contends that the "doctrine of res ipsa loquitur applies to a case where a person is injured because of lack of oxygen getting to the brain while unconscious by reason of anesthesia and is in the sole control of the Defendant or its agents, servants or employees because the general experience and observation of mankind teaches that the result would not be expected without negligence and the injury must have been caused by an agency or instrumentality in the control of the Defendant and the injury was not due to any voluntary action or contribution on the part of the Plaintiff." *Id.*, paragraph 7. Defendant contends that no evidence of negligence is proffered by plaintiff, and with respect to plaintiff's argument based on res

ipsa loquitur, defendant asserts that the doctrine has never been applied to a medical malpractice action in Massachusetts, has at least implicitly been rejected, and that application of the doctrine here "would be an unwarranted extension of Massachusetts law, contrary to the intent of the Federal Tort Claims Act that federal courts will apply existing state law rather than create new law." Defendant contends also that even if Massachusetts law did accept the doctrine, it would not apply to the present case. Defendant's Pre-Trial Memorandum, paragraph 4.

Defendant filed a Motion for Summary Judgment on December 19, 1979, and at a further Pre-Trial Conference on December 21, 1979, the parties were allowed time for written submissions before oral argument, which was heard on February 15, 1980. In light of issues addressed at the oral argument, plaintiff, for reasons referred to *infra*, was allowed an additional 10 days for further submissions. No further submissions having been filed within the further allowed time, the court now addresses the defendant's motion for summary judgment.

## II.

In support of its motion for summary judgment, defendant submitted an affidavit of Dr. Edward R. Roaf, to which was attached, as Exhibit A, a copy of "all of the medical and hospital records pertaining to the operation on the knee of Julius Haas on October 12, 1971, at the West Roxbury Veterans Administration Hospital." Affidavit of Edward R. Roaf, January 21, 1980, paragraph 2. Based on his review of these records, and for reasons detailed in the affidavit, *id.*, paragraph 5, Dr. Roaf stated:

4. Based on my complete review of these records, it is my firm opinion that Mr. Haas' failure to regain normal cerebral function was not caused by any negligence on the part of the anesthesiologist, anesthetist, or any of the other VA medical personnel who attended to him before, during, or after the surgery. Rather, it is my opinion that the care and treatment provided to Mr. Haas at the

pre-operative, operative, and post-operative stages was fully in accord with the accepted standards of the medical profession, and that the anesthesiologist met or exceeded the standard of care and skill of the average member of the profession practicing the specialty of anesthesia, taking into account the advances of the profession.

The affidavit adds:

6. After my complete review of the hospital and medical records in this case, I am unable to state what caused Mr. Haas to suffer the severe loss of cerebral function which presently impairs him. The records are complete, well-kept, and indicative of proper medical standards being followed before, during, and after the surgery. Most importantly, all vital signs are normal during the entire anesthetic and surgical period, which flatly contradicts the possibility of an anoxic episode having occurred to deprive Mr. Haas of sufficient oxygen during this period. A deprivation of the necessary amount of oxygen would have to be reflected in blood pressure, pulse, respiration, and/or EKG, all of which were normal during this entire period. Additionally, all signs point to Mr. Haas responding normally and being on the road to normal recovery from anesthesia until about 12 noon, 1½ hours after completion of surgery.

In short, the cause of Mr. Haas' present condition is not discernible from the medical and hospital records, but it is clear that a deprivation of oxygen or anoxia was not the cause. The hospital and medical records reveal no negligent act or omission by any of the VA medical personnel which caused Mr. Haas' injury.

Unfortunately, general anesthesia, by its very nature as a trespass on a person's normal physiology, carries with it an inherent risk of loss of cerebral function and even death. Such tragic results can and do occur in a certain number of cases even where general anesthesia is administered with all due care, in full accord with accepted medical standards, and without any negligence whatsoever. General anesthesia has a morbidity and mortality rate approximately four or five times that for spinal anesthesia.

In a supplemental affidavit of February 15, 1980, Dr. Roaf adds:

1. I have read those portions of plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment in which plaintiff's attorney alleges that plaintiff suffered brain damage as a result of an anoxic episode whereby his brain was deprived of oxygen while he was under general anesthesia (see plaintiff's Memorandum, pp. 4, 7, 13, 14, 16). As indicated in my first Affidavit (p. 4, ¶ 6) this possibility is flatly contradicted by the normalcy of all vital signs revealed by the close monitoring which took place during the entire anesthetic and surgical period. While it is true that ordinarily in circumstances like this an anoxic episode would be suspected initially, that tentative suspicion must be categorically rejected in light of a review of the carefully monitored and recorded vital signs during the entire relevant period. Based on a retrospective review of the entire set of medical records, including those of the entire postoperative period, it is my firm conclusion that there is simply no medical evidence either in the medical records or presented in plaintiff's Memorandum supporting the conclusion that Mr. Haas suffered deprivation of oxygen to the brain, or that such a deprivation caused his injuries. There is no medical explanation which would square the alleged anoxic episode with his normal vital signs during the entire period in which the oxygen deprivation allegedly took place.

2. I have also read those portions of plaintiff's Memorandum in which plaintiff's attorney alleges that "men in their common knowledge and experience know that the brain of an unconscious patient would not be deprived of oxygen unless someone caring for him was negligent" (p. 16; see also pp. 13–14). This statement is medically false and inaccurate. Medical science makes it clear that an anoxic episode whereby the brain is deprived of oxygen during general anesthe-

sia can occur in a large number of circumstances in which there is absolutely no negligence by the medical personnel treating that individual. For example, the patient can suffer a sudden heart attack, pulmonary embolism blocking the flow of blood, shock in which peripheral blood circulation fails, an acute blood loss from surgery leading to shock, or a lack of blood glucose which causes brain cells to die. All of these examples can result in an anoxic episode despite the patient's having been treated properly and without any negligence whatsoever. The only way that such a situation can be detected is through monitoring the vital signs and noting that some or all of them are abnormal. But even with proper and frequent monitoring, such abnormalities do not always show up in time to prevent brain damage. In short, a patient under general anesthesia can have an anoxic episode whereby the brain is deprived of oxygen, and suffer brain damage as a result, even if he or she is treated properly in conformity with accepted medical practice, and without any negligence whatsoever. (As noted in ¶ 1, *supra*, however, this could not have been the case with Mr. Haas.)

3. I have also read that portion of the plaintiff's memorandum which raises certain questions plaintiff's attorney claims should be explained by doctors for the defendant (pp. 6–7). Although there is no contention—by expert or layman—that the alleged acts or omissions alluded to in these questions constitute medical negligence, or that they caused Mr. Haas' injuries, nonetheless for sake of clarification I respond by stating that none of the alleged acts or omissions alluded to in these questions constitute improper or negligent medical treatment, and there is absolutely no evidence that any of them caused or in any way contributed to Mr. Haas' injuries. More specifically:

(1) (pp. 6, 11)—There was no need for an extensive second pre-anesthetic evaluation of Mr. Haas on the day of, or the day before, the operation. Because he was noted to be physical status "1" (the healthiest status), and the operation was to be performed on a chronic, longstanding knee injury, it was highly unlikely there would be any change in his condition warranting a new evaluation. Accordingly, the lapse of time between the initial pre-operative evaluation and the operation itself was insignificant, particularly in light of the pre-anesthesia review conducted immediately prior to the operation which noted normal blood pressure and pulse, and pre-oxygenation (an excellent precaution against loss of oxygen during insertion of the tracheal tube). Additionally, on page 11 plaintiff's attorney notes that the same premedication which had originally been ordered on October 6 for spinal anesthesia was administered on October 12 despite the change to general anesthesia. This was perfectly appropriate, as the same premedication is used to sedate the patient prior to administration of either type of anesthesia.

(2) (pp. 6–7)—The entry under "Special Information" on the October 6, 1971 pre-anesthetic summary (Exhibit B to Defendants' Memorandum) was added after October 6 in order to update and correct the chart so as to reflect the most current information. This is common and accepted medical practice in order to correct stale, outdated, and inaccurate information previously placed on such charts.

(3) (p. 7)—It is clear from the records that Mr. Haas was "coming around" sufficiently to be extubated in the operating room. Exhibit C to Defendants' Memorandum (the anesthesia chart) notes in the right margin that when he went to the "R.R." (recovery room), which occurs after extubation in the operating room, his condition was satisfactory. Nothing in the records evidences any signs of difficulty in the operating room itself. On the contrary, surgery was completed at 10:30 a. m., and the fact that it was not until 12 noon in the recovery room that a problem was first noted indicates the propriety of extubation in the operating room. In fact, if there had been any difficulty noted while Mr. Haas was be-

ing extubated in the operating room, it would have been countered by immediate re-intubation. The ready availability of re-intubation as a precaution is the very reason extubation is performed in the operating room rather than the recovery room.

This supplemental affidavit having been filed on the day of oral argument on the motion for summary judgment, the court allowed plaintiff 10 days to confer with plaintiff's medical expert and to file any counter-affidavit or request leave for any further discovery. The case has been ably presented by plaintiff's counsel, and the court is confident that the absence of any counter-affidavit and any request for further discovery is not for want of diligent and thorough inquiry by plaintiff's counsel.

Plaintiff opposes defendant's motion for summary judgment on four grounds:

(1) a motion for summary judgment is inappropriate to a civil action for personal injuries due to negligence because the issue of negligence is uniquely for the trier of fact;

(2) there is a genuine issue as to material facts; to wit, the act or acts of the Defendant's employees or agents which caused the injuries sustained by the Plaintiffs;

(3) the doctrine of res ipsa loquitur applies to the instant case and therefore a genuine issue as to a material fact is presented to the trier of fact; and

(4) if the law of Massachusetts is undecided on whether the doctrine of res ipsa loquitur applies to the instant case and since the better reasoned and more current trend in the law in this Country favors its applicability, this Court should report to the Supreme Judicial Court of Massachusetts the question of the applicability of the doctrine of res ipsa loquitur to this case.

Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, p. 2 (filed February 11, 1980).

■ As to the first ground, it is, of course, true that negligence is uniquely for the trier of fact, but only if a factual issue is presented by the evidence. The court must look to the validity of plaintiff's second and third arguments in determining whether any material factual issue is presented in this case. Of course, on motion for summary judgment the court cannot accept affidavits submitted by the defendant as conclusive on any issue of fact. It is plaintiff's obligation, however, under Fed.R.Civ.P. 56, to produce, by affidavit or otherwise, evidence of a genuine dispute of material fact. Even though issues of negligence are ordinarily issues of fact, summary judgment is appropriate when the available evidence in the particular case, as disclosed to the court through supporting and opposing affidavits and exhibits submitted in relation to a motion for summary judgment, demonstrates that there is no genuine issue of material fact. E. g., *Gates v. Ford Motor Co.,* 494 F.2d 458 (10th Cir. 1974); *Crum v. Continental Oil Co.,* 471 F.2d 784 (5th Cir. 1973). The court does not find in the affidavits and exhibits before the court on this motion any evidence, within the records of treatment or elsewhere, that would support a finding of any specific act or omission of negligence causing the injuries on which this action is based. Nor has plaintiff, in the written submissions and in the oral argument of February 15, 1980, though explicitly invited to do so, been able to call any such evidence to the court's attention. In these circumstances, the court's decision on the motion for summary judgment turns on whether the motion should be denied on one or both of the grounds stated in plaintiff's third and fourth contentions, both of which relate to applicability of res ipsa loquitur to this case.

### III.

■ This action is governed by Massachusetts' law of medical malpractice since the United States is liable for injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances

where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

To frame the critical issue as if it were whether under Massachusetts law res ipsa loquitur is or is not applicable in medical malpractice cases is more likely to confuse than to illuminate questions concerning applicability of the doctrine to the present case. The reason this is so derives from basic characteristics of the doctrine in the law of Massachusetts and most other jurisdictions.

■ The doctrine of res ipsa loquitur allows for proof of negligence by circumstantial evidence. When negligence is proved by direct evidence, that evidence identifies *specified* acts or omissions, proves that they violated the standard of ordinary care, and proves that they caused injury. Proof of negligence by application of the doctrine of res ipsa loquitur is a way of showing negligence in some *unspecified* way by excluding all possibilities other than defendant's negligence, even though not going far enough to show just what defendant did or failed to do that was wrong. This may be done, for example, by proof that plaintiff was not negligent, that no third person was negligent, that defendant had exclusive control over the plaintiff and over instrumentalities affecting the plaintiff for a period of time, and that something happened to the plaintiff during that period of time that in human experience more probably than not would not have happened in the absence of negligence. This common sense view of res ipsa loquitur as a doctrine permitting circumstantial inferences rather than producing some further legal consequence is supported in the law of Massachusetts [1] and most other jurisdictions.[2] In relation to medical malpractice claims, ordinarily the res-ipsa route of reasoning is foreclosed because the inference that more

probably than not the injury would not have occurred in the absence of negligence cannot be drawn by a lay person without the aid of evidence from an expert witness. Prosser, Torts § 39 at p. 227 (4th ed. 1971). If, however, expert opinion is offered to bridge this gap in the evidence, then res ipsa loquitur may apply. *Id.*, n. 1. In such a case, expert testimony is an essential element of the proof, but it does not show any specified negligent act or omission of the defendant causing injury. Rather, it fulfills the need for one of the elements of the circumstantial chain of evidence on the basis of which the factfinder may reasonably conclude that, more probably than not, defendant was negligent in some unspecified way because all the other possible explanations of the injury have been excluded.

In *Semerjian v. Stetson*, 284 Mass. 510, 187 N.E. 829 (1933), the Supreme Judicial Court held that res ipsa loquitur could not be applied to defeat a motion for directed verdict in a medical malpractice case based on alleged negligence of a physician engaged to perform surgery to remove a growth from beneath the plaintiff's eyelid. The defendant doctor placed liquid drops in the eye after the surgery, and the plaintiff then suffered a burning sensation, severe pain, followed by inflammation of the cornea and the result that the sight of that eye was "practically lost." 284 Mass. at 512, 187 N.E. at 830. The court concluded that "the mere fact that pain, inflammation, and an ulcer in the plaintiff's eye followed the operation did not justify the inference of want of proper care and skill on the part of a doctor or warrant the conclusion that those conditions were the result of the doctor's negligence." 284 Mass. at 514, 187 N.E. at 830. The opinion of the court added: "The doctrine of res ipsa loquitur is not applicable where as here the common knowledge or experience of men is not extensive enough to permit it to be said that the plaintiff's condition would not have existed except for the negligence of the per-

---

**1.** *E.g., Coyne v. John S. Tilley Co.*, 368 Mass. 230, 255, 331 N.E.2d 541 (1975); *Evangelio v. Metropolitan Bottling Co.*, 339 Mass. 177, 158 N.E.2d 342 (1959).

**2.** *See generally* Prosser, Torts § 39 at p. 213 (4th ed. 1971).

son charged." 284 Mass. at 515, 187 N.E.2d 831.

On similar reasoning, other Massachusetts decisions have declined to apply res ipsa loquitur in the cases at issue. *E. g., Murphy v. Conway*, 360 Mass. 746, 277 N.E.2d 681 (1972) (death from massive streptococcal infection two days after Caesarean delivery); *Erban v. Kay*, 342 Mass. 779, 174 N.E.2d 667 (1961) (cardiac arrest while undergoing an operation with spinal anesthesia; death the next day); *Vartanian v. Berman*, 311 Mass. 249, 40 N.E.2d 867 (1942) (operation for removal of gall bladder; the patient stopped breathing while the wound was being sewn up and efforts to resuscitate failed).

No Massachusetts case applying res ipsa loquitur to a medical malpractice claim has been called to the court's attention. As this court reads the precedents in Massachusetts, however, they do not establish that Massachusetts law completely precludes the application of res ipsa loquitur to medical malpractice claims. It may be doubted, for example, that medical opinion testimony would be required to support the inference of negligence if a sponge remained in the patient's abdomen after an abdominal operation. See Prosser, Torts § 39 at pp. 227–228 and n. 4 (4th ed. 1971). It is unnecessary in the present case, however, to address this question since it does not appear that precedent from any jurisdiction would support application of res ipsa loquitur in a case such as is now before this court.

The case on which plaintiff relies most heavily—which also is at least as favorable to plaintiff's position as any other case of which the court is aware—is *Pederson v. Dumouchel*, 72 Wash.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967). The minor plaintiff in that case was injured in a car accident. The treating physician called in a dentist for the purpose of reducing the plaintiff's fractured jaw under general anesthesia in surgery at a hospital. The plaintiff apparently had no brain injury before the operation. While in the recovery room, the plaintiff suffered convulsive seizures. He remained unconscious for nearly a month.

The court found in the record of jury trial a sufficient basis in evidence and expert opinion "to support the conclusion that the plaintiff suffered severe and permanent brain damage from cerebral anoxia or hypoxia (complete or partial deprivation of oxygen to the brain) while he was anesthetized during surgery, and that cerebral anoxia or hypoxia was due to inadequate ventilation of the patient during the anesthesia and post-operative period." 72 Wash.2d at 75–76, 431 P.2d at 976, 31 A.L.R.3d at 1108. The plaintiff requested an instruction to the jury that, in effect, advised them that they might find negligence by applying the doctrine of res ipsa loquitur. This instruction was denied, and the plaintiff appealed from judgment on a jury verdict for the defendants. The Supreme Court of Washington concluded that the case fell within both of the following categories of cases: first, "when the general experience and observation of mankind teaches that the result would not be expected without negligence" and, second, "when proof by experts in an esoteric field creates an inference that negligence caused the injuries." 72 Wash.2d at 81, 431 P.2d at 979, 31 A.L.R.3d at 1111. As to applicability of the first of these categories, the court added:

Not to awaken from a general anesthetic for almost a month, and then with apparent brain damage is so extraordinary an occurrence within the general observations of mankind as to raise an inference of negligence.

72 Wash.2d at 81–82; 431 P.2d at 979; 31 A.L.R.3d at 1120. As to applicability of the second category, the court added:

[T]here is definite, expert opinion testimony [in this case] from which it can be inferred that plaintiff's injury was the result of negligence. True, the argument is advanced that plaintiff had been in a serious automobile accident. At best, however, this only presents a jury question; for plaintiff was not operated upon for almost a day and a half after the accident. His own doctor, a defendant in this action, testified that prior to surgery plaintiff did not have any "gross or even minor brain injury."

The facts and the permissible inferences therefrom are sufficient, if believed by the jury, to support plaintiff's theory of the case. We conclude that plaintiff's requested instruction . . . should have been given. . . .

Since the requested instruction permits the jury to *infer* negligence in the absence of a satisfactory explanation in the circumstances of this case, defense counsel's constant argument that the plaintiff must prove something went wrong in surgery before there is any right to recover becomes inappropriate.

72 Wash.2d at 82, 431 P.2d at 979–980, 31 A.L.R.3d at 1112.

█ The facts of the present case are materially different from those in *Pederson*. Here, an affidavit presents to the court expert medical opinion, based upon a review of records of the medical treatment, contradicting plaintiff's contentions (1) that plaintiff's undisputed brain damage was caused by an anoxic episode[3] and (2) that it is common knowledge from human experience that the brain of an unconscious patient would not be deprived of oxygen unless someone caring for the patient was negligent.[4] No counter-affidavit has been filed. In these circumstances, to determine that res ipsa loquitur applies would be to decide that a court may disregard uncontested medical opinion evidence contradicting one of the key findings on which applicability of res ipsa loquitur is based—that the incident is one that, in ordinary human experience, more probably than not would not have occurred in the absence of negligence. This court is not aware of any precedent, in Massachusetts or elsewhere, for extending the doctrine of res ipsa loquitur that far.

For the foregoing reasons, the defendant's motion for summary judgment will be allowed and final judgment will be entered for the defendant.

**3.** "There is no medical explanation which would square the alleged anoxic episode with his normal vital signs during the entire period in which the oxygen deprivation allegedly took place." Supplemental Affidavit of Dr. Edward R. Roaf, ¶ 1.

