[No. 42040. En Banc. July 20, 1972.]

DONALD ZEBARTH, *Respondent*, v. SWEDISH HOSPITAL
MEDICAL CENTER, *Appellant.*

*Williams, Lanza, Kastner & Gibbs, Joseph J. Lanza, Culp, Dwyer, Guterson & Grader,* and *William L. Dwyer,* for appellant.

*Daniel F. Sullivan,* for respondent.

HALE, J.—Defendant hospital administered to plaintiff a course of radiation therapy in treating him for Hodgkin's disease. About a year after the treatments had ended, plaintiff became paralyzed from injury to his spinal cord. He brought this action against the hospital alleging negligence in the treatment, and a jury returned a verdict in the

sum of $450,280. Defendant hospital appeals a judgment entered upon that verdict, making five assignments of error.[1]

Plaintiff, 23 years of age and on active duty with the United States Coast Guard, was stationed at Coos Bay, Oregon, when he was taken to the Coos Bay Hospital with a fever, May 9, 1963. The doctor treating him observed a pulling, nontender mass on the right of his neck. After the fever had subsided for 24 hours, plaintiff was transferred at the direction of his unit medical officer to the United States Public Health Service Hospital in Seattle. On admission to that hospital on May 15, 1963, his principal symptoms were shortness of breath on exertion, pain in the right shoulder and low back, and a persistent cough.

Physical and laboratory examination at the public health hospital led to a tentative diagnosis of Hodgkin's disease. The doctors there observed a 1½ cm. node in the right supraclavicular fossa and a .6 cm. node in the left. Biopsy of the right node, May 21, proved it to be malignant, and it was identified by the pathologist as Hodgkin's sarcoma. Hodgkin's disease, it was agreed, is a generalized malignancy involving the reticuloendothelial system—that is, cells within the lymph system; sarcoma is a tumor deriving from cells of an internal layer of the skin (epithelium). The doctors at the public health hospital told plaintiff that he had Hodgkin's disease, that it was a form of cancer, and that it would require extensive treatment. The record is not clear whether he was told it was a fatal disease although all experts agree that, if left unimpeded by therapy, it will with extremely rare exception prove fatal. It is a virtual certainty, however, that plaintiff knew he was very seriously ill. A bronchoscopy performed at the hospital June 3 revealed a mass in the area of the trachea and adjacent

[1] "1. Refusing to grant defendant's motion for a directed verdict;

"2. Refusing to grant defendant's motion for judgment n.o.v.;

"3. Giving of Instruction No. 3 on the doctrine of res ipsa loquitur;

"4. Giving of Instruction No. 7 on informed consent; and

"5. Refusing a new trial despite misconduct of plaintiff's counsel in closing argument."

main stem bronchi. Due to a decrease in the caliber of the bronchi, the doctor could not pass an 8 mm. bronchoscope beyond the mass, indicating a very serious obstruction of the trachea.

Dr. Frederick Warren Lovell, a specialist in pathology, called by the plaintiff, testified that he had reviewed the medical records and reports pertaining to plaintiff and had examined the microscope tissue slides. He concluded, as did other specialists, that, at the time plaintiff entered the defendant clinic, he was suffering from the "subgroup of malignant lymphoma" identified more particularly as "Hodgkin's sarcoma" or, as it is otherwise described, "reticulum cell sarcoma." Referring to one of the slides, the doctor said it showed "a highly malignant undifferentiated neoplasm," and that the outermost covering of the affected area of the body, known as the epithelium, showed marked changes from normal tissue, the changes being known as metaplasia. Corroborating other medical specialists on this point, Dr. Lovell said that the lymphoma afflicting plaintiff was one of a group that is very responsive to radiation, pointing out that lymphomas respond much better to radiation therapy than that other group of cancers known as carcinoma.

After reviewing the hospital records of myelograms that had been taken, and the records of bone marrow studies, and having examined the plaintiff's bone marrow, in response to the question as "to whether or not Mr. ZeBarth's present paraplegia is due to the radiation he received," Dr. Lovell testified that in his opinion, "[Mr. ZeBarth] has irradiation myelitis in the spinal cord at the level of approximately the 5th dorsal vertebra." Referring to external appearance and some apparent amendments or changes in the records of the amounts of radiation administered to the patient, the doctor testified that the defendant's skin showed a marked radiation scarring reaction on his back and that ZeBarth had probably received substantially more radiation to his back than the record indicated.

During the course of his testimony, the plaintiff related how his progressive paralysis, beginning about 12 months

after completion of the radiation therapy, led to his wife's obtaining a divorce from him; how the progressive paralysis gradually prevented him from pursuing his hobby and sometime vocation, auto mechanics; how it interfered with his relationships with his two children; how he required constant care and assistance with the most basic bodily functions; how, because of his inability to exercise any muscle control, he had to wear a catheter constantly and suffered chronic infection from it; how the damage to his spinal cord has resulted in severe, persistent pain to the paralyzed portion of his body; how he suffered resultant increasing dependence on, if not actual addiction to, narcotic drugs; and how he has seizures of uncontrollable muscle spasms which develop frequently despite the muscle relaxant drugs which he takes regularly on prescription. The defendant makes no claim that the verdict of the jury is excessive or that it was the result of passion or prejudice.

Seven highly trained and certified medical specialists testified in the case, including one neurosurgeon, two radiotherapists and radiologists, two radiotherapists, a pathologist and a physician engaged in completing his residency in radiation therapy at defendant Swedish Tumor Institute. In the course of his treatment for Hodgkin's disease, plaintiff received nitrogen mustard therapy, too, and there was a conflict among the medical specialists as to whether this contributed to the cause of the paralysis. There was no substantial conflict among them, however, that a total dosage of 4,000 Roentgen (R.) of radiation administered over a 4-week period in fractionated doses did not depart from accepted medical standards, but there was a dispute as to whether a first dose in the amount of 1,000 R. was excessive and dangerous.

It was upon this initial 1,000 R. dose that the issue of negligence as a fact largely depended, but there were other claims of negligence, too. The evidence conflicted on whether the first treatment of 1,000 R. was properly administered, and whether the remaining total treatment did not in fact exceed the 3,000 R. as recorded. From medical testi-

mony describing plaintiff's physical condition after the radiation and the appearance of his skin considered in relation to the amount and duration of the entrance and exit doses and viewed in connection with some amendments to and inconsistencies and alterations in the medical records, the jury could infer that plaintiff had received more than the recorded 3,000 R. of radiation after the initial 1,000 R. treatment.

Dr. John Hunt Walker, for example, testified that in his opinion there had been an error in calculation made at the beginning of the fractionated doses, and he observed changes in the records reflecting the dimensions of the entry portal. So slight an error in these dimensions, he said, would increase the entry dose by 20 percent, and thus increase the amount of radiation reaching the spinal cord. There was other evidence from which the jury could infer that plaintiff may have received an additional 1,000 R., for one of the defendant's staff doctors had made a notation in the patient's record of treatment indicating a 1,000 R. midplane tumor dose administered from the level of the hyoid down, an area not encompassed in the other medical records.

All of these varying considerations of fact were, we think, resolved at trial. There was a sharp conflict in the evidence given by highly trained and qualified medical specialists as to whether the plaintiff on his first visit to defendant institute was in such extreme emergency as to require a massive first dosage to preserve his life. There was an equally sharp conflict as to whether, assuming such an extreme emergency, a lesser fractionated dosage at the outset would be expected to produce such a swelling of the trachea and adjacent tissue so as to deprive the patient of breath and thereby life. There was testimony to the contrary: that plaintiff, ambulatory and suffering little physical discomfort at the time of the first examination and treatment by defendant, was not in extremis and that, allowing for the normal and expected growth of the cancer, he still had many days over which the treatment could have been

extended without further endangering his life and, moreover, with substantially less risk of myelopathy.

■ As earlier noted, defendant moved for a directed verdict and judgment non obstante veredicto, and assigns error to the denial of these motions. Our study of the record convinces us that there was sufficient evidence of negligence to take the case to the jury, and we therefore apply the long-established rule that, if there is substantial credible evidence to support the verdict it will be sustained. Since the evidence sustains the verdict, these particular assignments of error need no further discussion.

Defendant assigns error to instruction No. 3[2] given to the jury on the subject, *inter alia*, of res ipsa loquitur. Although that instruction embraces circumstantial evidence, direct evidence, and res ipsa loquitur, defendant's exception to it and the assignment are directed to the last two paragraphs—those which concern res ipsa loquitur. Defendant contends that this is not a case for the application of res ipsa loquitur because the facts of the case would not warrant an inference of negligence in the absence of direct proof of it, and that medical testimony giving rise to such an inference is not present in the record. Thus, defendant urges, this is not the kind of case in which res ipsa loquitur may be properly invoked as a matter of fact, nor one in which expert medical testimony can be properly said to evoke the doctrine either. The jury ought not be instructed as to res ipsa loquitur, says the defendant, for it is merely a principle that lets a case get by a challenge to the evidence or functions only to get past a nonsuit, and is not evidence nor suitable instructional material to explain the absence of evidence.

■ Under circumstances proper to its application, res ipsa loquitur generally does apply to physicians and hospitals. *Douglas v. Bussabarger*, 73 Wn.2d 476, 438 P.2d 829 (1968); *Leach v. Ellensburg Hosp. Ass'n, Inc.*, 65 Wn.2d 925, 400 P.2d 611 (1965); *Pederson v. Dumouchel*, 72 Wn.2d

---

[2]See Appendix A.

73, 431 P.2d 973 (1967); *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.*, 62 Wn.2d 351, 382 P.2d 518 (1963); *Nelson v. Murphy*, 42 Wn.2d 737, 258 P.2d 472 (1953); Annot., 51 A.L.R.2d 970 (1957). When a proper case is generally made out for res ipsa loquitur, so far as we know the doctrine is under no taboos as to subject matter and may be invoked without regard to the nature of the events upon which liability is asserted if the facts and circumstances shown at trial would otherwise warrant it. Thus, the tests for res ipsa loquitur have remained substantially the same as when the doctrine was first explicitly described in *Byrne v. Boadle*, 159 Eng. Rep. 299, 2 H. & C. 722 (1863), the case where a barrel for no provable reasons rolled out of an upstairs window onto the plaintiff below, injuring him. Referring to the rationale of the barrel case in applying it to surgery, this court said in *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc., supra* at 360:

> Granting exclusive control of the instrumentality and eliminating voluntary participation or contribution by respondent to the acts producing the injury, we feel that negligence may then be inferred in three situations without affirmative proof thereof: (1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.*, leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.

Now, as then, the doctrine depends upon exclusive control over the instrumentality producing the injury complained of; a corresponding want of control by the injured party to take action on his own behalf to avert the injury; and a resultant kind of injury which, in the common experience and observation of mankind, does not happen in the absence of negligence, or, as in this case, when experts in an esoteric field, that is, highly specialized medical doctors, give testimony that the injury would not have happened

but for some negligent omission or action on the part of those administering the radiation therapy.

The record in this case permits inferences of the existence of all elements for the application of res ipsa loquitur including that of experts in an esoteric field. It shows in the treatment of a deadly disease the beneficient employment of an extremely complex although widely used device of such power and destructive capabilities as in the interests of reasonable care and prudence should be used only by highly-trained and qualified experts. The record shows that this machine, the Van de Graaff, 2,000,000 volt radiation device, was operated under the exclusive control and dominion of the defendant hospital and its agents, and it shows, too, a corresponding lack of an appreciable control and dominion over it by plaintiff ZeBarth. Once the patient had passed under the combined dominion of the machine and the control of the experts who operated it, he had lost virtually all power over his own destiny. Although he may have sought out the doctors who operated it, and in effect implored treatments from the machine, his injury from it in contemplation of law was as though he had been hit on the head by a barrel then under the exclusive control of another. Thus, the first essential to the doctrine, exclusive control over the instrumentality, with no intervening or contributing control by the plaintiff, existed here.

Secondly, high voltage radiation in the treatment of cancer has been widely enough and long enough employed in this country to allow the jury to find that, within the experience and observation of mankind, myelopathy or paralysis ordinarily will not result from its use except for the intervention of someone's negligence. This matter of common knowledge was reinforced by evidence from qualified experts that a patient who receives a course of radiation therapy to the area of the lungs and trachea does not come out of the treatment paralyzed from the waist down without the intervention of negligence. And finally, on this aspect, there was testimony of highly specialized experts in an esoteric field, *i.e.*, radiation therapy, that myelopathy

from radiation was a rare phenomenon and probably resulted from too high a concentration of radiation within a given period of time.

One doctor, a radiotherapist of international renown, testified that he had never seen a permanent injury due to radiation from a 1,000 R. dose, nor from that amount given in one dose with a total additional amount of 3,000 R. fractionated. Thus, Dr. Walter Disney Rider of Toronto, Canada, testifying from an extremely broad experience and a high degree of training said, in effect, that he had never observed the kind of injury or a paralysis of the nature suffered by plaintiff from the amount of radiation given him in the manner and amounts defendant hospital's personnel said it had been given.[3] Other highly trained specialists disagreed, and explained further that too high a concentration of radiation not only could but in their experience had been known to produce a myelopathy.

There was evidence, too, from which the jury could infer that defendant's records did not accurately reflect the exact dosages plaintiff had received, and that the paralysis was due to an overlapping of the radiation fields, that is, that the radiation to the supraclavicular field and posterior mediastinal fields partially overlapped so as to deliver more radiation to the patient's spinal cord than had been recorded or intended. And there was evidence from which could be inferred an unintentional repetition of the massive first dose of 1,000 R. on June 4, 1963, so that plaintiff had received an intolerably higher dosage to his back at one time than due care and prudence would allow. And there was evidence from which the jury could infer that the radiation therapists administering the initial 1,000 R. dose had failed in this instance to accept and apply what is known in radiation therapy as the "Strandqvist curve"—a

---

[3]"All the instances in my personal experiences of cord injury have been in patients who have had either second courses of radiation and there has been an overlap of the two fields of radiation, the two ports of radiation, or they have had some other contributing factor, like injury or drugs. I personally have not had a primary cord damage in the one course of radiation uncomplicated."

formula for computing the dosage equivalents, from which a preponderance of medical authority concludes that a 1,000 R. tumor dose would be the equivalent of about 1,800 R. fractionated or delivered in smaller doses at separate time intervals.

Res ipsa loquitur does not, and did not here, operate to deprive defendant hospital of its defense on the merits. Inferences of negligence arising from the doctrine and evidence were met with persuasive evidence to the contrary. But, although defendant presented weighty, competent and exculpatory proof of due and reasonable care and prudence, the ultimate issue of fact was one for the jury to decide.

Altogether there was the testimony of experts in an esoteric field, one of exceptional complexity and scientific sophistication, from which it could be inferred that paralysis does not ordinarily result from radiation therapy unless the therapy has been somehow negligently administered, and additionally there were the general and ordinary experiences of mankind that people do not emerge from a course of radiation therapy paralyzed from the waist down unless there has been negligence in the treatment. The instruction on res ipsa loquitur was, therefore, proper. Binder, *Res Ipsa Loquitur in Medical Malpractice,* 17 Clev.-Mar. L. Rev. 218 (1968); Wickhem, *Res Ipsa Loquitur in a Medical Malpractice Case,* 40 Wis. Bar Bull. 31 (1967); *Res Ipsa Loquitur in California Medical Malpractice Law,* 18 Hastings L.J. 691 (1967); *The Application of Res Ipsa Loquitur in Medical Malpractice Cases,* 60 Nw. U.L. Rev. 852 (1966); *Medical Malpractice—Res Ipsa Loquitur and Informed Consent in Anesthesia Cases,* 16 DePaul L. Rev. 432 (1967).

 The next assignment of error is directed to instruction No. 7[4] concerning what has become known in medical

---

[4]The court's instruction No. 7 reads:

"A doctor engaging in the practice of a medical specialty has the duty to comply with the standard of such practice with regard to informing his patient about the nature and probable results of any proposed radiation treatment and of any alternate methods of radiation treatment known or which should be known to the specialist, the nature and extent of any serious risks involved in any of the methods

malpractice cases as "informed consent." Informed consent, an obvious misnomer, identifies a principle covering situations where medical treatment involves a grave risk of collateral injury and puts the physician under a duty to advise the patient of such risks before initiating the treatment. Informed consent, therefore, is the name for a general principle of law that a physician has a duty to disclose what a reasonably prudent physician in the medical community in the exercise of reasonable care, would disclose to his patient as to whatever grave risks of injury may be incurred from a proposed course of treatment so that a patient, exercising ordinary care for his own welfare, and faced with a choice of undergoing the proposed treatment, or alternative treatment, or none at all, can, in reaching a decision, intelligently exercise his judgment by reasonably balancing the probable risks against the probable benefits. *See* Waltz & Scheuneman, *Informed Consent to Therapy,* 64 Nw. U.L. Rev. 628 (1969-70). Failure to impart such information to the patient is by the great weight of authority deemed negligence rendering the physician liable for injuries proximately caused thereby.

▮ What proof is necessary to establish a duty to inform? From time to time cases may arise where the obligation upon the physician to inform his patient of the risks of

---

of treatment and in a refusal of treatment known or which should be known to the specialist but which the patient does not, but should know in order to enable the patient to weigh and balance the anticipated benefits from the respective methods of treatment as opposed to the risks and hazards involved in each and in a refusal of treatment, so the patient can determine whether to consent to the treatment.

"Failure to perform this duty is negligence even though the therapy might be administered and performed with that degree of skill otherwise required.

"This duty, however, is limited to those disclosures which, according to the recognized medical standards of that specialty, should be given by a reasonable doctor practicing the same specialty, in the same or similar circumstances. The standards must be proven by testimony of members of the medical profession practicing the same specialty.

"If therapy is administered without valid consent, it renders those responsible for such administration liable for any damages proximately resulting therefrom."

treatment is so manifest that a layman, even without the benefit of medical testimony, could reasonably find that the benefits from the proposed therapy would be so slight in relation to the gravity of the risks of harm from it that no medical testimony would be required to prove the duty to inform. For example, high voltage, heavy dosage radiation therapy utilized to treat a wholly benign wart would undoubtedly call for a duty to inform without expert medical testimony to prove it. But in most instances, and as a general rule, the duty to inform the patient must be established by expert medical testimony or reasonable inferences to be drawn from it. Thus, as stated by Waltz & Scheuneman (64 Nw. U.L. Rev. 628, 636), "The great majority of courts follow some professional standard, variously worded. The largest group within this majority would measure the duty according to the custom and practice of physicians within the 'community.'" Some courts within the majority group require the disclosure that a reasonable practitioner would make under the circumstances; others require disclosure consistent with "good medical practice." Whatever may be the verbal formula, however, these courts generally require expert testimony to prove a duty to inform.

We deem it to be the prevailing view and one which should be followed by this court that generally the duty of the physician to inform and the extent of the information required should be established by expert medical testimony. This principle, we think, was suitably expressed in the court's instruction No. 7, which, speaking of that duty, states:

> This duty, however, is limited to those disclosures which, according to the recognized medical standards of that specialty, should be given by a reasonable doctor practicing the same specialty, in the same or similar circumstances. The standards must be proven by testimony of members of the medical profession practicing the same specialty.

We note parenthetically that, although defendant

submitted a proposed instruction on the subject of informed consent, this did not deprive it of the claim of error directed to the giving of any instruction whatever on that subject nor function as a waiver of its exception to instruction No. 7 as given. The record shows that the defendant preserved its record of claimed error by taking lucid and cogent exceptions to the giving of any instruction whatever on the subject in general, and to the one given by the court in particular. Defendant's proposed instruction No. 4[5] on the subject of informed consent was offered after the court had ruled that it would charge the jury upon that subject.

The duty of a medical doctor to inform his patient of the risks of harm reasonably to be expected from a proposed course of treatment does not place upon the physician a duty to elucidate upon all of the possible risks, but only those of a serious nature. Nor does it contemplate that the patient or those in whose charge he may be are completely ignorant of medical matters. A patient is obliged to exercise the intelligence and act on the knowledge which an ordinary person would bring to the doctor's office. The law does not contemplate that a doctor need conduct a short course in anatomy, medicine, surgery and therapeutics nor that he do anything which in reasonable standards for practice of medicine in the community might be inimical to the patient's best interests. The doctrine of informed consent does not require the doctor to risk frightening the

---

[5]Defendant's proposed instruction No. 4:

"A physician has a duty to make such disclosures to the patient as are reasonable under the circumstances and which are necessary for the patient to form an intelligent and informed consent to the treatment. The disclosure should include those risks in the contemplated procedure which a reasonable physician should know about, and which the patient does not, but which the patient should know in order to determine whether to consent to the procedure. Failure to perform this duty is negligence.

"This duty, however, is limited to those disclosures which according to recognized medical standards should be given in the same or similar circumstances, and must be proved by testimony of members of that profession."

patient out of a course of treatment which sound medical judgment dictates the patient should undertake, nor does the rule assume that the patient possesses less knowledge of medical matters than a person of ordinary understanding could reasonably be expected to have or by law should be charged with having. Nor should the rule declaring a duty to inform be so stated or applied that a physician, in the interest of protecting himself from an overburden of lawsuits and the attendant costs upon his time and purse, will always follow the most conservative therapy—which, while of doubtful benefit to the patient exposes the patient to no affirmative medical hazards and the doctor to no risks of litigation.[6] Thus, the information required of the doctor by the general rule is that information which a reasonably prudent physician or medical specialist of that medical community should or would know to be essential to enable a patient of ordinary understanding to intelligently decide whether to incur the risk by accepting the proposed treatment or avoid that risk by foregoing it. A doctor or specialist who fails to discharge this duty to inform would thus be liable as for negligence to the patient for the harm proximately resulting from the treatment to which the patient submitted. Whether the information should have been given at all and the nature, kind and extent of the disclosure thus must in most instances be established by expert medical testimony. *Anderson v. Hooker,* 420 S.W.2d 235 (Tex. Civ. App. 1967); *Simone v. Sabo,* 37 Cal. 2d 253, 231 P.2d 19 (1951). And the standards are those of the medical community of which the physician is a part rather than the geographic location of his practice. *Douglas v. Bussabarger,* 73 Wn.2d 476, 438 P.2d 829 (1968); *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973 (1967). We perceive the general rule to be—except in extraordinary circumstances where the duty to disclose is so clearly manifest that reasonable minds could not in reason differ on the question—that the standards of the medical profession are those to be applied

---

[6] *See The Medical Malpractice Threat: A Study of Defensive Medicine,* 1971 (No. 5) Duke L.J. 939.

by the jury in deciding that issue of fact. *See Advise and Consent in Medicine: A Look at the Doctrine of Informed Consent,* 16 N.Y.L.F. 863 (1970); *Natanson v. Kline,* 186 Kan. 393, 350 P.2d 1093, *modified,* 187 Kan. 186, 354 P.2d 670 (1960). *Accord, Douglas v. Bussabarger, supra.*

The rules imposing upon a doctor the duty to inform his patient of the possibilities of serious harm or injury from a proposed course of treatment, we are aware, may present dangers to patient and physician alike, and if extravagantly interpreted might in some degree impede the advancement of medical science or operate to deprive the patient of the most modern therapy and latest scientific developments, but these possibilities do not, we think, justify its abrogation. The duty to disclose remains; and the failure to discharge it is negligence.

The question is first a medical question going to the roots of medical judgment in determining what is best for the patient, and then a matter of law as to whether there is sufficient evidence to put the issue to the jury. When the issue is raised in the courts, it is a question of fact for the jury, after considering medical testimony, whether the physician met the standard of his profession under the circumstances. It is a question of fact, and only very rarely solely a question of law. *Cf. Mason v. Ellsworth,* 3 Wn. App. 298, 474 P.2d 909 (1970); *Starnes v. Taylor,* 272 N.C. 386, 158 S.E.2d 339 (1968).

Dr. Orliss Wildermuth, a highly trained specialist in radiation therapy, practicing on the staff of defendant tumor institute, said that from a medical standpoint a patient about to undergo radiation therapy should be advised in terms of ordinary understanding by his physician of the nature and effect of radiation therapy and the nature and effect of possible alternative treatments, and that the patient needed this medical information in order to reach an intelligent decision as to whether he would undergo the risks. Dr. Frederick Exner, a physician specialist in radiology, called by plaintiff, was more emphatic as to this duty and said in effect that the duty to inform the patient was

specifically imposed by the very essence of good practice; and that this was done as a time-honored custom as well as a duty required of a physician in the practice of medicine.[7]

None of the authorities nor the already extensive literature on the subject of informed consent, including Johnson, *Medical Malpractice—Doctrines of Res Ipsa Loquitur and Informed Consent*, 37 U. Colo. L. Rev. 182 (1965); McCoid, *The Care Required of Medical Practitioners*, 12 Vand. L. Rev. 549, 586 (1959); Plante, *An Analysis of "Informed Consent,"* 36 Fordham L. Rev. 639 (1968); Sevier, *The Hazards of Medical Treatment: The Duty to Inform and the Right to Know*, A.B.A. Sec. of Ins., Neg. & Comp. Law 396 (1967); Waltz & Scheuneman, *Informed Consent to Therapy*, 64 Nw. U.L. Rev. 628 (1969-70); *Informed Consent in Medical Malpractice*, 55 Calif. L. Rev. 1396 (1967); *Medical Malpractice—Res Ipsa Loquitur and Informed Consent in Anesthesia Cases*, 16 DePaul L. Rev. 432 (1967); *Informed Consent as a Theory of Medical Liability*, 1970 Wis. L. Rev. 879; *Failure to Inform as Medical Malpractice*, 23 Vand. L. Rev. 754 (1970), specifies the precise extent or degree of information which must be imparted to meet the medical standards of ordinary care in the practice of medicine. It is,

---

[7]Dr. Exner testified:

"At that time, and for 400 years before, and ever since, it has been the duty of a physician, before treating a patient, to tell him what treatment was proposed, what was hoped to be accomplished thereby, what hazards might exist, and to explain—and one other thing—any possible alternative methods of achieving the desired result. And it was the duty of the physician to explain those things in such terms that the patient understood insofar as he was capable of understanding all those things so the patient could retain the right to decide what should be done to him and accept or reject the offered treatment, this being ordinarily referred to as obtaining the patient's informed consent."

Referring to changes in or additional treatment, he said:

"The reason is that the procedures for which the original consent was obtained had been carried out. They had achieved everything that could possibly have been covered in the request for consent. And if further treatment were to be given, it was mandatory that the patient be told what had been accomplished, what the doctor thought needed still to be accomplished and why, and all the same things gone through that had been before, what alternatives are there, what are the hazards, just as had been required for the original consent."

however, generally recognized by the great weight of judicial and scholarly authority that the law does place this duty upon the physician and that the failure to meet it is characterized as a species of negligence.[8]

Because the rule declaring the duty cannot be stated with marked precision, the nature and extent of the disclosure required by it depends in each case upon the peculiar circumstances giving rise to the duty. Thus, our holding can be stated in general terms: a physician's duty to inform his patient is to inform his patient what a reasonably prudent medical specialist would tell a person of ordinary understanding of the serious risks and the possibility of serious harm which may occur from a proposed course of therapy so that the patient's choice will be an intelligent one, based upon sufficient knowledge to enable him to balance the possible risks against the probable benefits. *Salgo v. Leland Stanford, Jr. University Bd. of Trustees,* 154 Cal. App. 2d 560, 317 P.2d 170 (1957); *Scott v. Wilson,* 396 S.W.2d 532 (Tex. Civ. App. 1965), *aff'd, Wilson v. Scott,* 412 S.W.2d 299 (Tex. 1967). The extent of the disclosure is a matter of medical judgment. *Aiken v. Clary,* 396 S.W.2d 668 (Mo. 1965); *Wilson v. Scott,* 412 S.W.2d 299 (Tex. 1967). For discussions and collections of case law on this point, *see* Fraser & Chadsey, *Informed Consent in Malpractice Cases,* 6 Willamette L.J. 183 (1970); *Informed Consent in Medical Malpractice,* 55 Calif. L. Rev. 1396 (1967); Sevier, *The Hazards of Medical Treatment: The Duty to Inform and the Right to Know,* A.B.A. Sec. of Ins., Neg. & Comp. Law 396 (1967); and *Failure to Inform as Medical Malpractice,* 23 Vand. L. Rev. 754 (1970).

We think, therefore, that the court's instruction No. 7 stating, *inter alia,* that

> Failure to perform this duty is negligence even though the therapy might be administered and performed with that degree of skill otherwise required.

---

[8]W. Prosser, Torts § 32, at 165 (4th ed. 1971). A wholly unauthorized operation would constitute a battery as well as malpractice. *Physicians' & Dentists' Business Bureau v. Dray,* 8 Wn.2d 38, 111 P.2d 568 (1941).

> This duty, however, is limited to those disclosures which, according to the recognized medical standards of that specialty, should be given by a reasonable doctor practicing the same specialty, in the same or similar circumstances. The standards must be proven by testimony of members of the medical profession practicing the same specialty.

correctly stated the law of this jurisdiction.

Integral to the rule of informed consent is the issue of proximate cause. The plaintiff did not categorically state that, had he known or been informed of the risks of myelopathy, he would not have accepted the treatment. Thus, although the trial court, in our opinion, properly assessed the record and gave an instruction on "informed consent," was instruction No. 7 as given proper under the law of this jurisdiction? This question, we think, should be answered in the affirmative.

At trial, the court first had to determine whether the evidence warranted an instruction on the subject of informed consent, *i.e.*, whether the evidence showed a duty upon the doctors to inform the patient (*Watkins v. Parpala,* 2 Wn. App. 484, 469 P.2d 974 (1970)), and then, assuming that the circumstances shown generally supported such an instruction, whether it, nevertheless, should have been refused because the plaintiff did not testify directly that had he known the risks he would not have accepted the proposed treatment. *See Mason v. Ellsworth,* 3 Wn. App. 298, 474 P.2d 909 (1970).

Plaintiff professed little knowledge of the possible harmful effects of radiation therapy. He testified that he received no advice or information whatever from defendant institute or the treating physicians as to the hazards of radiation therapy or the harm that might result from it. Neither was the amount, duration and degree of fractionation mentioned to him. He realized that Hodgkin's is regarded as a fatal disease if unarrested; he was in no position to decline radiation therapy despite the hazards of treatment. He thus had no effective choice between some

radiation treatment and the almost certain death without it.

But there was a vital choice open to him, had he been informed of the alternative: the initial large dose with the dangers of myelopathy, or a markedly lesser fractionated dose with its attendant danger of swelling. The totality of evidence permits an inference that, had plaintiff been informed that a massive initial dose carried with it a possible danger of a paralysis-inducing myelopathy, in contrast to the usual and lesser dosages so fractionated that the ultimate total amounted to the same, he would have chosen the latter course.

■ Instruction No. 7, although susceptible of improvement, sufficiently advised the jury that there must not only be a breach of the duty to inform, but that defendant would be liable only for such injuries as resulted proximately from this breach. This brings the case within the principle stated in *Natanson v. Kline,* 187 Kan. 186, 354 P.2d 670 (1960), one of the leading cases, we think, on this subject where, at page 191, it is said:

> While the appellant did not directly testify that she would have refused to take the proposed cobalt irradiation treatments had she been properly informed, we think the evidence presented by the record *taken as a whole* is sufficient and would authorize a jury to infer that had she been properly informed, the appellant would not have taken the cobalt irradiation treatments.

The law does not encourage formulaic or catechistic responses, but looks instead to substance. For the plaintiff to say, after the fact of injury, that he would have refused the initial massive dose, adds little to the credible proof. Although admissible, a statement of that nature is little more than a transparently self-serving response, inviting the recital of a formulated catechism to put form above substance. There was no disagreement among the medical specialists who gave evidence that a patient does have a right to be informed of those risks necessary for an intelligent decision as to whether a proposed course of therapy would be accepted or declined, but the doctors disagreed—as do

the courts—on the extent of such required advice and the details to which it should be carried.

We are of the opinion that the record warranted submitting the issue of informed consent to the jury and that it was not reversible error to give instruction No. 7 nor to refuse defendant's proposed instruction No. 4.

Defendant's assignment of error directed to the asserted misconduct of counsel in closing argument we find to be without merit.

The judgment is, therefore, affirmed.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, and WRIGHT, JJ., concur.

APPENDIX A

The court's instruction No. 3 reads:

"Evidence is of two kinds—direct and circumstantial. In giving direct evidence, a witness testifies directly of his own knowledge concerning facts to be proved. Circumstantial evidence is proof of certain facts and circumstances from which may be inferred other and connected facts which usually and reasonably follow according to the common experience of mankind.

"The value and weight of circumstantial evidence are to be determined from its character and nature and from its relation to all of the other facts otherwise established by the other evidence in the case. Nothing in the nature of circumstantial evidence renders it less valuable than other evidence.

"In connection with the foregoing, you are instructed that it is for you to determine whether the manner of the occurrence of the injury sustained by Donald ZeBarth, and the attendant circumstances connected therewith are of such character as would, in your judgment, warrant an inference that the injury would not have occurred had due diligence and care been exercised by defendant's employees.

"The rule is that when an agency or instrumentality which produces injury is under the control of a defendant or its employees, and the injury which occurred would ordinarily not have resulted if those in control had used proper care, then, in the absence of satisfactory explanation, you are at liberty to infer, though you are not required to so infer, that the defendant, or its employees, were at some point negligent, and that such negligence produced the injury complained of by the plaintiff."

NEILL, J. (dissenting in part)—I disagree with the majority's treatment of the res ipsa loquitur issue. The necessary elements of res ipsa are present and plaintiff is en-

titled to the inference of negligence which gives rise to a jury question as to the negligence of the defendant. However, as elucidated in the lead opinion in *Zukowsky v. Brown,* 79 Wn.2d 586, 488 P.2d 269 (1971), the doctrine has fulfilled its function in preventing a nonsuit or challenge to the sufficiency of the evidence, unless for some reason of fact or policy, the inference of negligence in the particular case is strong enough to invoke a greater procedural effect. The majority states no such reason. The first three paragraphs of instruction No. 3 given by the court (set forth as an appendix to the majority opinion) fully apprises the jury of its right to infer negligence from the facts and circumstances presented by the evidence. The fourth paragraph of that instruction unduly overbalances the instruction in favor of plaintiff.

*Zukowsky* recognized the inconsistencies in our prior cases and attempted an approach that would be reckonable. The requirements for applicability of res ipsa were therein restated and broadened and a basic distinction was drawn between "ordinary" cases, where the procedural effect was to simply get by a nonsuit with no "highlighting" instruction, and those cases where, as a matter of *articulated* fact or policy, the res ipsa inference would have the effect of shifting some evidentiary burden to the defendant. The rationale of that opinion was not put forward as an absolute answer, but rather as a hopeful beginning toward a coherent replacement for the previous tangle of self-contradiction in our cases. For example, the distinction as to procedural effect could be made even more definite in certain types of cases (such as medical malpractice) by treating the policies underlying a shift in the evidentiary burden as an issue basically separate from res ipsa considerations. *Zukowsky* poses no obstacle to a result favoring this plaintiff. Rather, *Zukowsky* would require a different analytical approach which is, I suggest, more rational and more candid than an unexplained, self-contradictory application of labels and effects.

Today's majority represents an attempt to end *Zukow-*

*sky*'s beginning and a return to the prior state of "result decrees," unfettered by recognition of a need to be reasonably consistent. No effort is made by the majority to engage in a discussion of the *Zukowsky* rationale, nor to grapple with the considerations and problems therein discussed, nor to put forward any alternative analysis. Instead, the majority has chosen a power-expedient of ignoring the case. If our efforts in that case to come to grips with the problems are to be thus cast aside, I can only voice protest and observe that it deserves a more judicious demise.

I dissent.

STAFFORD, J., concurs with NEILL, J.

Petition for rehearing denied September 11, 1972.