[No. 10687-6-II.   Division Two.   August 17, 1988.]

MARY L. TATE, *Plaintiff,* v. DEBORAH A. PERRY, ET AL, *Appellants,* GEORGE A. WEIS, ET AL, *Respondents.*

258

*Nancy K. McCoid, H. Roland Hofstedt,* and *Merrick, Hofstedt & Lindsey,* for appellants.

*Timothy R. Gosselin, Steven F. Fitzer,* and *Burgess, Kennedy, Fitzer & Strombom, P.S.,* for respondents.

REED, C.J.—Deborah A. Perry appeals the court's dismissal of her third party negligence complaint against George A. Weis, M.D. The sole issue is whether the doctrine of res ipsa loquitur should have been permitted to carry the case to the jury. We affirm.

Mary L. Tate sustained injuries to her back when her car was struck from behind by that of Deborah A. Perry on July 20, 1983, in Pierce County. Tate complained of various symptoms, which caused her treating physician, Dr. Kenneth J. Ritter, to refer her to a neurologist, Dr. James S. Griffith. After reviewing her case, Griffith, concurring with Ritter, prescribed a cervical–lumbar myelogram. (In a cervical–lumbar myelogram, the medical practitioner injects a contrast material into the sac of fluid surrounding the spinal column, then takes and interprets X–rays of the spine from the lower back to the neck.)

Dr. George A. Weis, a diagnostic radiologist, performed Tate's myelogram at St. Joseph Hospital on November 7. Weis used a solution of metrizamide in this procedure. Metrizamide is a water soluble, iodine–containing contrast material, which mixes with the spinal fluid and is dissipated later in the course of normal body functions.

After the myelogram, Weis returned Tate to the care of her treating physician. The next day, Tate showed evidence of a severe adverse reaction to her treatment (she was unresponsive and disoriented). Her physicians described

the condition as encephalopathy. On the same day the hospital conducted a CT–scan to determine the cause of the encephalopathy. That showed metrizamide around the brain. Later, a physician diagnosed Tate's problem as encephalopathy induced by metrizamide.

Tate filed a complaint for negligence against Perry (and her husband, Charles) on February 13, 1985. Perry in turn filed a third party complaint against Weis, alleging that the physician failed to obtain Tate's informed consent for the myelogram, and that he negligently performed it.[1] During trial, Weis testified that he did not remember Tate's myelogram specifically. He stated, however, that he followed the same procedure for all cervical–lumbar myelograms. According to this testimony, he placed Tate face down on the table, which was angled with the foot area 30 to 45 degrees down. He then inserted a needle into her lower back and withdrew spinal fluid. Next, he inserted metrizamide. (The record shows that Weis used a 23–gauge needle to inject a solution of metrizamide in a concentration of 220 to 240 milligrams per milliliter.)

Weis filmed the lumbar area. With the aid of fluoroscopic control, he tilted the table slowly until the dye gravitated to the cervical area. When enough dye was present for an adequate examination, he filmed that area. (Weis testified that he always tried to keep the metrizamide from being "dumped" into the head, but, he asserted, that was not always possible.) Afterward, he returned Tate to an upright, standing position. This position, according to Weis, slows the intracranial advancement of the metrizamide (the majority of the dye is absorbed in this area, however).

Weis stated that most of the metrizamide was absorbed in the membranes covering the surfaces of the cerebrum. He noted, however, that the path that metrizamide followed as it advanced into the head could not be controlled.

---

[1]The parties raise no issue regarding Perry's "contribution" or "indemnification" claim. Consequently, we do not address it.

Weis asserted that nothing unusual occurred during Tate's examination.

Three other physicians also testified at trial. Dr. Christian Killien, a diagnostic radiologist, testified that, in his reading of the CT–scan, the metrizamide had been absorbed into the folds of the brain and the linings of the ventricles. He also stated that it was normal to find metrizamide on a CT–scan of the head and brain on the day after myelography. Further, he stated that he had seen that much metrizamide in the brain in other circumstances with no long term complications. (According to him, metrizamide was approved for direct injection into the brain.)

Dr. John Huddlestone, a neurologist, indicated that Tate's CT–scan showed some swelling of the brain. He did not know, however, if that CT–scan was normal because such examinations generally are not performed the day after a myelogram. According to him, Tate's reaction to metrizamide was an unavoidable complication in some patients. He stated that acute confusion and acute encephalopathy were known risks of metrizamide myelography. Although long–term trouble was rare, he indicated that some people suffered persistent problems from contact with metrizamide. He concluded that there was no evidence in the records that indicated that Weis's technique was faulty.

Dr. Gary K. Stimac, a diagnostic radiologist and an adjunct assistant professor of neurosurgery, testified that if Weis followed the routine he described, Tate's examination was performed properly. He also indicated that the quality of the films indicated that Weis performed the examination correctly. Further, he stated that it was not always possible to prevent all of the metrizamide solution from moving to the head. According to him, the dye at the base of Tate's skull was inevitable (some dye in all myelograms spills into the head). He noted, too, that the majority of the dye was at a lower level in the body.

Stimac indicated that metrizamide starts out in the spine or ventricles and is cycled, eventually, to the top of the brain where it is absorbed into the veins over the top of the

brain and thence into the bloodstream. (Metrizamide follows the same pathways as the cerebrospinal fluid.) He asserted that Tate's CT–scan was normal for a person who had undergone a myelogram on the previous day. According to him, CT–scans are not usually done after a myelogram because many patients experience disorientation, headaches, and other adverse effects from myelograms.

Stimac stated that Weis used a smaller needle and a less concentrated solution than he generally recommends (Stimac stated that Weis's method was preferable). He also indicated that he saw neither evidence of deep brain penetration from the ventricles, nor trans–ependymal resorption. He admitted that rapid progression of metrizamide into the brain might cause more severe side effects. He also stated that the heavier the concentration of metrizamide in the head, the deeper the absorption by the brain. In addition he asserted that there were other procedures, for which metrizamide was used, which could cause a larger quantity of the dye to be present than was present in Tate's head on the day of her CT–scan. Stimac concluded that the conduct of Tate's myelogram was not faulty.

During Stimac's testimony, Perry introduced the drug manufacturer's description of metrizamide from the *Physicians' Desk Reference* (1983) (PDR). That description indicates that, within 12 to 24 hours, the surfaces of the cerebrum and cerebellum in contact with the subarachnoid spaces (where the metrizamide circulates) will develop a blush effect on the scan that will normally disappear in 36 to 48 hours. It also states that care should be taken to prevent an inadvertent intracranial entry of a large dose or concentrated bolus of the dye.

In addition, the PDR states that among the known adverse reactions are headache, nausea, seizures, perceptual aberrations (hallucinations, depersonalization, anxiety, confusion, disorientation, weakness, malaise). Profound mental disturbances have been reported rarely. The PDR concludes with a statement that there is clinical evidence that reactions, particularly seizures and mental aberrations,

tend to be the result of overdosage or patient mismanagement. At the close of trial, the court dismissed Perry's negligence claim but permitted the issue of informed consent to go to the jury. The jury found for Weis and awarded judgment to Tate against Perry.

Perry argues that the court erred in refusing to submit her third party negligence claim to the jury. Even if there was no proof of actual negligence, she insists that her claim should have been considered under the doctrine of res ipsa loquitur. We disagree.

■ To prevail on a complaint of negligence, Perry must show duty, a breach of that duty, and injury.[2] *Hartley v. State,* 103 Wn.2d 768, 777, 698 P.2d 77 (1985). In addition, she must show that the breach of duty was the proximate cause of the injury. *Hartley v. State, supra.* Breach of duty may be proved by circumstantial evidence under the doctrine of res ipsa loquitur. *Douglas v. Bussabarger,* 73 Wn.2d 476, 482, 438 P.2d 829 (1968). Perry must offer evidence that demonstrates the existence of three criteria: (1) that the occurrence producing the injury was of a kind that ordinarily does not occur in the absence of negligence; (2) that the injury was caused by an agency or instrumentality within the exclusive control of the defendant; and (3) that the injury causing occurrence was not due to any contribution on the part of the injured party. *Bussabarger,* 73 Wn.2d at 484; *Jackson v. Criminal Justice Training Comm'n,* 43 Wn. App. 827, 829–30, 720 P.2d 457 (1986).

Here, there is no evidence that Weis failed to exercise the skill and care of a reasonably prudent diagnostic radiologist in the state of Washington. *See Watson v. Hockett,* 107 Wn.2d 158, 166, 727 P.2d 669 (1986). There is no evidence that he used an excessive dosage of metrizamide in Tate's myelography (in fact the reverse is true). Nor is there evidence that Weis permitted a concentrated mass or bolus of the dye to enter Tate's head. Nevertheless, Perry insists

---

[2]Tate is not a party in this appeal.

that Tate's symptoms point to overdosage or patient mismanagement, and that the doctrine of res ipsa loquitur is applicable.

Weis concedes that he had exclusive control over Tate's myelogram. He also does not contest that Tate did not contribute to her injury. In such a situation, negligence can be inferred if either: (1) the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.*, leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; or (2) the general experience of observation of mankind teaches that the result would not be expected without negligence; or (3) proof by experts in an esoteric field that creates an inference that negligence caused the injuries. *ZeBarth v. Swedish Hosp. Med. Ctr.,* 81 Wn.2d 12, 19, 499 P.2d 1, 52 A.L.R. 3d 1067 (1972).

We cannot infer negligence as a matter of law. Metrizamide cannot be equated with foreign objects in the body. Although Tate's CT–scan showed metrizamide around the brain, this is an expected effect of the dye's absorption in the cerebrospinal fluid. Eventually, it was dissipated. Its disposition is different from that of sponges, scissors, and other foreign objects left within the body.

Nor does the general experience and observation of mankind teach that Tate's symptoms would not have occurred without negligence. The known side effects of metrizamide are headache, nausea, seizures, and perceptual aberrations (hallucinations, depersonalization, anxiety, confusion, disorientation, weakness, malaise). Although Tate's reactions appear to have been more severe than some of these, the general experience of mankind cannot ascribe that to negligence. *Cf. Pederson v. Dumouchel,* 72 Wn.2d 73, 81–82, 431 P.2d 973, 31 A.L.R.3d 1100 (1967) (patient awakened with brain damage a month after general anesthesia); *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wn.2d 351, 359–60, 382 P.2d 518 (1963) (patient awakened with paralyzed arm after sedation for hysterectomy).

Finally, there was no proof by experts from which it can be inferred that negligence must have caused Tate's injuries. All of the medical experts disclaimed this as a factor in her injuries. Even were we to grant the *Physicians' Desk Reference* the stature of medical opinion,[3] its commentary on metrizamide fails to establish that side effects, such as those experienced by Tate, *do not occur in the absence of negligence.* In such a situation, we think that the court correctly dismissed the complaint of negligence. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* 242 (5th ed. 1984); S. Speiser, *Res Ipsa Loquitur* §§ 2:4–2:5 (1972). *See also Watson,* 107 Wn.2d at 161–62 (mere fact that therapy produces an unfavorable result does not necessarily mean that there was negligence); Speiser § 24:9.

---

[3]First, it is not clear what effect was to be accorded this evidence by the jury. Second, we do not hold that this tool is the equivalent of expert medical opinion. The pertinent text is as follows:

Care is required in patient management to prevent inadvertent intracranial entry of a large dose or concentrated bolus of the medium. Also, effort should be directed to avoid rapid dispersion of the medium causing inadvertent rise to intracranial levels (eg, by active patient movement). Direct intracisternal or ventricular administration for standard radiography (not CT) is not recommended.

In most reported cases of *major motor seizures* one or more of the following factors were present. Therefore, *avoid:*

Deviations from recommended procedure or in myelographic management.

. . .

Inadvertent overdosage.

Intracranial entry of a bolus or premature diffusion of a high concentration of the medium.

. . .

There is clinical evidence that reactions, particularly seizures and mental aberrations, following the administration of myelographic doses in excess of those recommended tend to be dose related. Even use of a recommended dose can produce effects tantamount to overdosage, if incorrect management of the patient during or immediately following the procedure permits inadvertent early intracranial entry of a large portion of the medium.

*Physicians' Desk Reference* 2340–41 (1988). Mrs. Tate did not suffer a "major motor seizure."

There being no evidence or reasonable inference there-from to support Perry's claim of negligence, we affirm the judgment of the trial court.

PETRICH and WORSWICK, JJ., concur.

Reconsideration denied October 6, 1988.